STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION AND NORTH CAROLINA NATURAL GAS CORPORATION v. PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION (INTERVENOR), AND CITIES OF WILSON, ROCKY MOUNT, GREENVILLE AND MONROE, NORTH CAROLINA (INTERVENORS)

No. 124A87

(Filed 8 December 1988)

1. **Utilities Commission § 51— appellate review of decision of Utilities Commission**

   The Supreme Court's statutory function in reviewing a decision by the Utilities Commission is to assess whether the Commission's order is affected by errors of law, and to determine whether there is substantial evidence, in view of the entire record, to support the position adopted.

2. **Utilities Commission § 41— return on common equity—case law on overall rate of return**

   Our case law addressing the overall rate of return is apposite to the rate of return on common equity.

3. **Utilities Commission § 41— fair rate of return—subjective judgment**

   Under N.C.G.S. § 62-133, the determination of what is a fair rate of return requires the exercise of subjective judgment.

4. **Utilities Commission § 41— fair rate of return—presumption of reasonableness —appellate review**

   The Utilities Commission, not the courts, is authorized by the legislature to determine what is a fair rate of return. Once fixed by the Commission, the rates are deemed prima facie just and reasonable, and the party attacking such rates bears the burden of proving that they are improper. However, this does not preclude appellant from showing on appeal that the order is not supported by competent, material and substantial evidence.

5. **Gas § 1; Utilities Commission § 41— natural gas rates—return on common equity—conclusion supported by evidence**

   The Utilities Commission's conclusion approving a 14.0% rate of return on common equity for a natural gas company was supported by competent, material and substantial evidence in view of the entire record.

6. **Gas § 1; Utilities Commission § 41— natural gas rates—return on common equity—ability of customers to switch fuels**

   The Utilities Commission could properly consider any increased risk to a natural gas company's investors caused by the possible loss of customers who may switch to alternate fuels in determining the company's rate of return on common equity.

State ex rel. Utilities Comm. v. Public Staff

**7. Gas § 1; Utilities Commission § 41— natural gas rates—return on common equity—size and management of utility**

The Utilities Commission did not err in considering the fact that a natural gas company is "a small but efficient and well-managed natural gas utility" in determining the company's rate of return on common equity where the sense of the Commission's order was that the utility's small size increased but its efficient management reduced investor risk, and the two factors tended to cancel each other. Furthermore, the law permitted the Commission to consider both size and management in assessing investor risk insofar as such risk may bear on an appropriate return on equity capital since a utility's small size may increase investor risk and justify a higher return, and good management could be considered as a factor which reduces investor risk and militates in favor of a lower return on equity capital.

**8. Gas § 1; Utilities Commission § 57— natural gas rates—return on common equity—specificity of findings**

The Utilities Commission's findings in support of its return on common equity conclusion in a natural gas rate case were sufficiently detailed and specific to comply with N.C.G.S. § 62-79(a). The Commission was not required to show the specific effect of each factor upon the ultimate rate of return approved.

**9. Gas § 1.1; Utilities Commission § 43— natural gas rates— customer classifications—rates of return—no unreasonable discrimination**

The Utilities Commission's order contained findings sufficient to justify its conclusion that approved rates of return for various classes of customers of a natural gas utility are just and reasonable and do not unreasonably discriminate against cities which are wholesale customers of the utility. N.C.G.S. § 62-140(a).

Justice MEYER dissenting.

Justice MARTIN dissenting.

Justice MEYER joins in this dissenting opinion.

APPEAL by the cities of Wilson, Rocky Mount, Greenville and Monroe, North Carolina (Cities), and Public Staff—North Carolina Utilities Commission (Public Staff) pursuant to N.C.G.S. § 7A-29(b) from the Utilities Commission's (Commission) final order entered on 10 November 1986 in Docket No. G-21, Sub 255, approving rates and charges for natural gas service provided by North Carolina Natural Gas Corporation (NCNG). Heard in the Supreme Court 9 February 1988.

*McCoy, Weaver, Wiggins, Cleveland & Raper by Donald W. McCoy and Alfred E. Cleveland for North Carolina Natural Gas Corporation, appellee.*

*David T. Drooz, Staff Attorney, and Gisele L. Rankin, Staff Attorney, Public Staff Legal Division, North Carolina Utilities Commission, intervenor appellant and appellee.*

*Spiegel & McDiarmid by David R. Straus, Cynthia S. Bogorad and Barbara S. Esbin; Poyner & Spruill by J. Phil Carlton for Cities of Wilson, Rocky Mount, Greenville and Monroe, North Carolina, intervenor appellants.*

EXUM, Chief Justice.

On this appeal from the Commission's final order granting partial increase in rates and charges to NCNG the questions presented are whether the Commission erred in concluding: (1) the approved rate of return on common equity for NCNG is supported by competent, material, and substantial evidence in view of the entire record; (2) the final order was sufficiently detailed and specific to comply with statutory law; (3) the approved rates established for the various classes of NCNG's customers do not unreasonably discriminate against Cities and are supported by competent, material and substantial evidence in view of the entire record. We hold the Commission did not err and affirm its final order.

I.

On this appeal, Public Staff and Cities set forth three basic contentions. First, Public Staff argues the Commission's finding approving a 14.0% rate of return on common equity for NCNG is unsupported by competent, material and substantial evidence in view of the entire record.[1] Second, Public Staff urges the Commission erred in not making specific findings for the approved return on equity and in denying the Public Staff's motion for specific

_____

1. The statutory basis for Public Staff's argument is from N.C.G.S. § 62-94(b) which provides: "The Court may . . . (5) reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are: . . . Unsupported by competent, material and substantial evidence in view of the entire record as submitted . . . ."

findings.[2] Last, Cities contend the Commission's conclusion that the RE-1 rate is not unduly discriminatory is not supported by the findings of fact; therefore, it is erroneous as a matter of law, arbitrary, and capricious.[3] We will address each of these arguments in turn.

NCNG provides natural gas to the public under a certificate of public convenience and necessity issued by the Commission. Wholesale natural gas service is provided to Cities, each of which is authorized under N.C.G.S. §§ 160A-311(4), -312 to own and operate a natural gas distribution service for its respective citizens. Cities take delivery of natural gas from NCNG at the "city gate" and distribute that gas through their municipally owned and operated distribution facilities to the residential, commercial, and industrial retail customers served by each city. The prices at which Cities sell gas to their customers is not subject to Commission regulation. NCNG also furnishes retail natural gas service in eastern North Carolina to residential, commercial and industrial customers.

NCNG has separate retail rate schedules for residential, commercial and small industrial, industrial process, and other commercial and industrial uses.[4] Industrial customers with alternate

---

2. The Public Staff contends the Commission's findings on this issue violate N.C.G.S. § 62-79(a). This statute provides in pertinent part:

All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:

(1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record . . . .

N.C.G.S. § 62-79(a)(1) (1982 Repl. Vol.).

3. The Cities' argument is based in part on N.C.G.S. § 62-140(a), which states: "No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service."

4. These schedules include: Rate Schedule 1—Residential; Rate Schedule 2—'ommercial and Small Industrial; Rate Schedules 3A and 3B—Industrial Process es; Rate Schedule 4A—Other Commercial and Industrial Non-IST customers; ? Schedule 4B—Other Commercial and Industrial IST customers; Rate Schedule ̱—Boiler Fuel Non-IST customers; Rate Schedule 5B—Boiler Fuel IST ̨ustomers; Rate Schedule 6A—Large Boiler Fuel Non-IST customers; Rate Schedule 6B—Large Boiler Fuel IST customers; Rate Schedule T-1—Transportation rate applicable to boiler fuel industrial volumes; and Rate Schedule T-2—Transportation rate applicable to nonboiler fuel industrial volumes.

fuel capability may be served under a negotiated rate.[5] NCNG serves the bulk of Cities' wholesale gas customers' needs under Rate RE-1, applicable to gas ultimately resold by Cities to Cities' residential, commercial and certain industrial customers. The remaining gas destined for certain other of Cities' industrial customers with alternate fuel capability is sold under SM-1, a rate negotiated with Cities.

Procedurally, this case comes to this Court as follows:

On 27 March 1986 NCNG filed an application with the Commission for authority to increase its rates and charges by $6,145,662 annually. NCNG proposed to make the new rates effective on 26 April 1986.

The Commission entered an order on 22 April 1986 that declared the application to be a general rate case pursuant to N.C.G.S. § 62-137, suspended the proposed rate increase for a period up to 270 days from the proposed effective date, required public notice and scheduled public hearings, required testimony and exhibits of parties other than NCNG to be prefiled by 15 July 1986, and set the matter for hearing on the evidence of the parties beginning 4 August 1986. NCNG filed supplemental testimony and exhibits on 30 June 1986 which raised the Company's requested rate increase from $6,145,662 to $8,193,100.

The Carolina Utility Customers Association, Inc. (CUCA) and Aluminum Company of America (Alcoa) filed Petitions to Intervene on 25 April 1986 and 10 June 1986, respectively. On 10 July 1986 Cities filed a Petition to Intervene and a Motion for Limited Admission to Practice by David R. Straus and Gary J. Newell of the Washington, D.C. law firm of Spiegel and McDiarmid. The Commission allowed all petitions and the motion.

A hearing panel consisting of Commissioner A. Hartwell Campbell, presiding, and Commissioners Sarah Lindsay Tate and Ruth E. Cook heard the case in chief in Raleigh from 4 August through 7 August 1986. The hearing panel entered a "Recommended Order Granting Partial Increase in Rates and Charges" on 15 October 1986, with Commissioner Cook dissenting in part.

5. Rate Schedule S-1 represents NCNG's negotiated rates for industrials served by NCNG.

The hearing panel found that 14.2% was a reasonable return on common equity for NCNG, and that NCNG's annual revenues should be increased by $6,100,577.

All parties duly filed exceptions to the hearing panel's recommended order. The Public Staff also moved the Commission to make specific findings with respect to the return on common equity allowed NCNG. The full Commission held oral arguments on the exceptions on 3 November 1986.

The Commission entered its "Final Order Granting Partial Increase in Rates and Charges" on 10 November 1986. The Commission found that 14.0% was a reasonable rate of return on common equity for NCNG, and that NCNG's annual revenues should be increased by $5,956,540. Chairman Robert O. Wells and Commissioner Ruth E. Cook filed dissenting opinions with respect to the rate of return issue.

NCNG filed revised tariffs and rate schedules that were designed to implement the Commission's 10 November 1986 final order. On 5 December 1986 the Commission entered an order approving the revised tariffs. Cities and Public Staff now appeal from the Commission's final order.

II.

A.

The Public Staff contends on this appeal that the Commission's finding[6] approving the 14.0% rate of return on common

---

6. The Commission has labeled its determination that 14.0% is a fair rate of return on common equity a "finding." What constitutes a fair rate of return on equity, however, is ultimately a matter of judgment and therefore more appropriately denominated a conclusion of law. *See, e.g., State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.,* 323 N.C. 238, 246 n.6, 372 S.E. 2d 692, 697 n.6 (1988); *State ex rel. Utilities Comm. v. Public Staff,* 322 N.C. 689, 693, 370 S.E. 2d 567, 570 (1988); *State ex rel. Utilities Comm. v. Eddleman,* 320 N.C. 344, 351-52, 358 S.E. 2d 339, 346 (1987). In this order as in previous orders the Commission's summary of evidence, findings of fact, and conclusions of law are mixed together in portions of the record denominated "Findings of Fact" and "Evidence and Conclusions for Findings of Fact." *Id.* Throughout this opinion we have tried to distinguish between and denominate findings and conclusions on the basis of the distinctions we drew in *Public Staff* and *Eddleman. Public Staff,* 322 N.C. at 693, 370 S.E. 2d at 570; *Eddleman,* 320 N.C. at 351-52, 358 S.E. 2d at 345-46. As this Court noted in *Eddleman,* "[a]s long as 'each link in the chain of reasoning' appears in the Commission's order, mislabeling is merely an inconvenience to the courts." *Eddleman,* 320 N.C. at 352, 358 S.E. 2d at 346.

equity[7] is unsupported by competent, material and substantial evidence in view of the entire record and therefore violates N.C.G.S. § 62-94(b)(5). More specifically, Public Staff argues "the Company's rate of return testimony is so riddled with contradictions and conflicting inferences that it fails as substantial evidence . . . ." In addition, Public Staff alleges the "Commission fail[ed] to indicate any valid basis in the evidence for awarding a higher return than Mr. Evans' 13.3%." Finally, Public Staff claims the Commission erred in ignoring other witnesses who testified regarding risks affecting NCNG's rate of return. NCNG responds that the Commission did properly exercise its discretion in setting the rate of return on common equity and its findings are supported by substantial evidence in view of the entire record.

In determining the appropriate rate of return on common equity the Commission relied on the direct testimony and exhibits of NCNG witnesses Wells and Butler, and Public Staff witness Evans. NCNG witness Wells testified that the company's immediate future is one of high risk. He explained that 70% of NCNG's gas sales and transportation volumes[8] in fiscal 1985 was

---

7. In the context of traditional utility regulation "rate of return" is a percentage which the Commission concludes should be earned on the rate base. *See State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.*, 323 N.C. at 244, 372 S.E. 2d at 696; N.C.G.S. § 62-133(b)(4) (1982 Repl. Vol. & 1988 Cum. Supp.); C. F. Phillips, Jr., *The Regulation of Public Utilities* 332 (1984). The "rate base" is the undepreciated original cost of the utility's property which is used and useful in providing service to the public. *See State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.*, 323 N.C. at 244, 372 S.E. 2d at 696; N.C.G.S. § 62-133(b)(1) (1982 Repl. Vol. & 1988 Cum. Supp.); C. F. Phillips, Jr., *The Regulation of Public Utilities* 158-59 (1984). The "rate of return on common equity" represents the annual percentage return to be allowed to the utility's stock investors. It represents but one component in the determination of the rate of return. The second component is the utilities cost of long-term debt or the "rate of return on debt." The weighted average of these two components based on the relative capital structure of the utility equals the company's overall "rate of return." *See generally* N.C.G.S. § 62-133(b)(4) (1982 Repl. Vol. & 1988 Cum. Supp.) (describing how Commission shall determine rate of return); J. C. Bonright, A. L. Danielson, & D. R. Kamerschen, *Principles of Public Utility Rates* 305-312 (1988) (discussing the determination of a fair rate of return on an original-cost rate base); C. F. Phillips, Jr., *The Regulation of Public Utilities* 345-376 (discussing the cost of capital standard in determining a fair rate of return).

8. NCNG's services also include the transportation of customer owned gas. These customers are served under Rate Schedule T-1—transportation rate applicable to boiler fuel industrial volumes and Rate Schedule T-2—transportation rate applicable to nonboiler fuel industrial volumes.

delivered to industrial and large commercial customers that are able to use oil or propane as an alternate fuel. Wells claimed gas prices under NCNG's present rates are higher than the prices of oil and propane fuels available to most of these customers and the Company would lose the majority of its industrial load if lower priced spot market gas were not available. Wells pointed out that even with the lower priced gas, NCNG has already lost three large industrial users. Wells' ultimate recommendation was for a 16.5% return on common equity, but he qualified his recommendation with the belief that the unusual risks facing NCNG justified even a higher rate of return.

NCNG witness Butler determined his recommended required return on common equity by dividing an investor's anticipated earnings per share by the per share book value of the Company's common stock.[9] Butler emphasized that NCNG's return on equity should reflect the higher-than-average risks created by the Company's heavy reliance on sales to industrial customers who have the ability to switch to alternate fuels. Butler's original prefiled testimony recommended a return on equity of 17.9%. In oral testimony, however, Butler adjusted his computations to reflect what he called "the Company's increased common equity base" since his original filing. Butler's adjusted rate and ultimate recommendation was for a return on equity of 16.8%.

Public Staff witness Evans relied principally on a discounted cash flow method (DCF) to estimate the appropriate rate of return on common equity for NCNG. "According to this method the proper rate of return is determined by adding to the common stock's current yield a rate of increase which investors will expect to occur over time." *State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. 689, 693-94, 370 S.E. 2d 567, 570 (1988); *See* C. F. Phillips, Jr., *The Regulation of Public Utilities* 356-57 (1984). Evans performed a NCNG specific DCF study which produced a return requirement of 13.42%. In order to provide a "check" on this result he applied the DCF method to two groups of companies "selected to be similar in risk to NCNG." This study produced rates of return of 12.73% and 12.41%. Based upon this

9. The formula used by Butler is as follows:

$1.92 current dividend per share divided by an estimated payout ratio of 55% equals $3.49 earnings per share. $3.49 earnings per share divided by $20.81 book value per share equals 16.8% return on equity.

analysis Evans concluded that a reasonable estimate of the cost of equity to NCNG was within the range of 12.8% to 13.8%. Evans ultimately recommended a 13.3% return on common equity.

Evans also "strongly disagree[d]" with NCNG witness Butler's testimony. In his opinion, Butler's methodology for estimating the cost of capital to NCNG was inappropriate because "it does not incorporate the market price of NCNG's stock and it also fails to consider expected returns on alternative investments of equivalent risk."

## B.

[1] N.C.G.S. § 62-94 prescribes the scope of appellate review of a decision by the Commission. Under this standard, the reviewing court

(b) . . . may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

(c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error.

N.C.G.S. § 62-94 (1982 Repl. Vol.). This Court's statutory function is to assess whether the Commission's order is affected by errors of law, and to determine whether there is substantial evidence, in view of the entire record, to support the position adopted. *State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.*, 323

N.C. 238, 243-44, 372 S.E. 2d 692, 695 (1988); *see, e.g., State ex rel. Utilities Comm. v. Eddleman,* 320 N.C. 344, 355, 358 S.E. 2d 339, 347 (1987); *State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.,* 316 N.C. 238, 242, 342 S.E. 2d 28, 31-32 (1986); *State ex rel. Utilities Comm. v. Carolina Utilities Customers Assoc.,* 314 N.C. 171, 179-80, 333 S.E. 2d 259, 265 (1985).

[2] Though we are addressing here only the rate of return on common equity which is but one component of the overall rate of return, this Court has stated "our case law addressing the overall rate of return is apposite." *Utilities Commission v. Duke Power Co.,* 305 N.C. 1, 30, 287 S.E. 2d 786, 803 (1982). The statutory guidelines for determining a utility's rate of return in a general rate case are set forth in N.C.G.S. § 62-133(b)(4). This statute provides that the Commission shall fix an overall rate of return on the cost of a utility's property that will enable a well-managed utility to: (1) produce a fair return for its shareholders, (2) allow the utility to maintain its facilities and services at a reasonable level, and (3) enable the utility to compete in the market for capital funds on terms that are reasonable and fair to its customers as well as its existing investors. *See* N.C.G.S. § 62-133 (b)(4) (1982 Repl. Vol. & 1988 Cum. Supp.). This Court has interpreted this statute to mean

> the Legislature intended for the Commission to fix rates as low as may be reasonably consistent with the requirements of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, those of the State Constitution, Art. I, § 19, being the same in this respect.

*Utilities Comm. v. Power Co.,* 285 N.C. 377, 388, 206 S.E. 2d 269, 276 (1974).

[3, 4]   Under N.C.G.S. § 62-133 the determination of what is a fair rate of return requires the exercise of subjective judgment. *Utilities Commission v. Duke Power Co.,* 305 N.C. at 23, 287 S.E. 2d at 799; *see Utilities Comm. v. Telephone Co.,* 298 N.C. 162, 178, 257 S.E. 2d 623, 634 (1979); *cf.* J. C. Bonright, A. L. Danielson & D. R. Kamerschen, *Principles of Public Utility Rates* 317 (1988) (describing the highly judgmental aspect of determining the cost of equity capital); C. F. Phillips, Jr., *The Regulation of Public Utilities* 363-64 (1984) (noting the difficulty in estimating the cost of equity capital and recognizing that estimates vary significantly). We emphasize that it is the Commission, not the

courts, which is authorized by the legislature to determine what is a fair rate of return. *State ex rel. Utilities Comm. v. Southern Bell,* 307 N.C. 541, 548, 299 S.E. 2d 763, 767 (1983); *Utilities Comm. v. Power Co.,* 285 N.C. at 396, 206 S.E. 2d at 276; *see Utilities Comm. v. Power Co.,* 285 N.C. 398, 413, 206 S.E. 2d 283, 295 (1974); *Utilities Commission v. Telephone Co.,* 266 N.C. 450, 457, 146 S.E. 2d 487, 492 (1966); *Utilities Commission v. Champion Papers, Inc.,* 259 N.C. 449, 456, 130 S.E. 2d 890, 895 (1963) (quoting *Utilities Comm. v. State and Utilities Comm. v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133 (1954) ). Once fixed by the Commission the rates are deemed prima facie just and reasonable. N.C.G.S. § 62-94(e) (1982 Repl. Vol.). The party attacking rates established by the Commission bears the burden of proving that they are improper. *State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.,* 316 N.C. at 242, 342 S.E. 2d at 31; *Utilities Commission v. Duke Power Co.,* 305 N.C. at 10, 287 S.E. 2d at 792. This does not preclude appellant from showing on appeal, if it can, that the order is not supported by competent, material, and substantial evidence. *State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.,* 316 N.C. at 242, 342 S.E. 2d at 32; *Utilities Commission v. Duke Power Co.,* 305 N.C. at 10, 287 S.E. 2d at 792; *Utilities Comm. v. Edmisten, Attorney General,* 291 N.C. 424, 428, 230 S.E. 2d 647, 650 (1977). The credibility of testimony and the weight to be accorded it are matters to be determined by the Commission. *State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.,* 316 N.C. at 242, 342 S.E. 2d at 36; *State ex rel. Utilities Comm. v. Southern Bell,* 307 N.C. at 549, 299 S.E. 2d at 768 (quoting *Utilities Commission v. Duke Power Co.,* 305 N.C. at 21, 287 S.E. 2d at 798); *Utilities Comm. v. Telephone Co.,* 285 N.C. 671, 688, 208 S.E. 2d 681, 691-92 (1974); *Utilities Comm. v. City of Durham,* 282 N.C. 308, 322, 193 S.E. 2d 95, 105 (1972). As this Court stated in *Utilities Comm. v. Telephone Co.,* 281 N.C. 318, 371, 189 S.E. 2d 705, 739 (1972):

> The weighing of the evidence and the drawing of the ultimate conclusion therefrom as to what is necessary to enable a utility to attract capital is for the Commission, not the reviewing court. It has been said many times that this is so because the Commission is a body of experts "composed of men of special knowledge, observation and experience" in the field of rate regulation.

*Id.*

## C.

[5] With these principles in mind we hold that the Commission's ultimate conclusion approving a 14.0% rate of return on common equity for NCNG is supported by competent, material and substantial evidence in view of the entire record. The final order shows that the Commission carefully reviewed the testimonies of Public Staff witness Evans and NCNG witness Butler. The Commission concluded the evidence indicated several existing factors which make NCNG more financially stable than in 1983 when the company was allowed a rate of return on common equity of 15.5%. These factors include: lower and more stable interest rates; investor confidence in the NCNG's stock and bonds; Commission approval of the IST;[10] and inclusion of the company's new LNG plant in the cost of service.[11] On the other hand, the Commission concluded the evidence supported the proposition that NCNG faces substantial risk of customers switching to oil or obtaining their own gas. NCNG is particularly vulnerable in this area because 70% of its sales volumes go to industrial customers who have this switching capacity.

---

10. The Industrial Sales Tracker (IST) is a ratemaking mechanism whereby NCNG is able to protect its profit margin on sales to customers who have the capability to use alternate fuels. As this Court has previously noted:

The IST applies to customers presently being served under Rate Schedule Nos. 4, 5, 6 and RE-1 that are capable of using heavy fuel oil as an alternate fuel. The Commission estimated the level of fixed cost recovery NCNG would obtain from these customers by subtracting projected variable costs from the revenues NCNG could expect to receive from IST customers. This calculation was based on anticipated sales and oil prices. The resulting figure is NCNG's allowed profit margin. If oil prices drop so that heavy fuel oil becomes cheaper to use than natural gas forcing NCNG to negotiate lower rates with its IST customers, the IST allows NCNG to add a surcharge to the rates of customers not covered by the IST to maintain its profit margin. If oil prices should increase allowing NCNG to make profits in excess of its allowed profit margin, the excess is passed on to the Non-IST customers by a credit. At the end of each year there is a "true-up."

*State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.*, 313 N.C. 215, 226, 328 S.E. 2d 264, 271 (1985).

11. NCNG witness Barragan testified that the primary reason for requesting this rate increase was to recover the annual operating and capital costs of the Company's new liquefied natural gas storage plant (LNG Plant). Barragan also testified the LNG Plant was built primarily to store liquefied natural gas in the summer to meet wintertime peak day demands and to provide system reliability and safety throughout the year.

Weighing the conflicting testimony of the expert witnesses, the Commission concluded that the rate of return on common equity of 16.5% requested by NCNG was clearly excessive, while the rate of return of common equity of 13.3% recommended by the Public Staff was too conservative. The Commission thereby settled upon 14.0% as a reasonable and appropriate rate for NCNG. The Commission thus set a rate of return within the range of those recommended by NCNG's witnesses on one hand and Public Staff's witness on the other. We can find no legal error affecting this determination.

Each of the Public Staff's contentions must fail. First, the Commission's order makes clear that it considered and gave some weight to the testimony and exhibits of Company witnesses Wells and Butler. Its order also makes clear that the Commission gave much greater weight to the testimony and exhibits of Public Staff's witness Evans. Evans testified "that a reasonable estimate of the cost of equity to NCNG is within the range 12.8% to 13.8%[,]" and the Commission's rate exceeded the upper range of this "estimate" by only .2%.

Second, the Commission did set forth several factors which supports its conclusion that a 14.0% rate of return on common equity is appropriate. In setting this rate of return the Commission actually reduced the return on common equity — 15.5% — allowed in NCNG's previous rate proceeding. In support of its common equity return conclusion the Commission said:

The authorized rate of return on common equity of 14.0% allowed herein is consistent with the evidence offered in this proceeding. Such evidence clearly indicates that interest rates have declined significantly since the Company's last general rate case Order in December 1983, when N.C.N.G. was allowed a rate of return on common equity of 15.5%. Furthermore, current interest rates are stable and the stock of N.C.N.G. is trading well above book value. The cost of financing is clearly lower than it has been in several years. The Company is a financially healthy utility. For instance, Company witness Butler testified that although N.C.N.G.'s mortgage bonds are not rated by either Moody's or Standard and Poor's, investors have regarded the Company's credit as worthy of A/A ratings. The 14.0% rate of

return on common equity allowed in this proceeding also reflects and recognizes the fact that the risk of N.C.N.G. has decreased as a result of continued approval of the IST and the inclusion of the Company's LNG plant in the cost of service.

On the other hand, the Commission is well aware of the current volatility of the gas market. N.C.N.G. faces the substantial risk of customers switching to oil or obtaining their own gas. This risk is exacerbated for N.C.N.G. because 70% of its sales volumes go to industrial customers. These factors certainly affect the reasonable rate of return which the Company should be allowed in this proceeding. The Commission recognizes that N.C.N.G. is a small but efficient and well-managed natural gas utility and, in recognition thereof, has authorized an appropriate rate of return in this proceeding which is consistent with such fact and current economic conditions and applicable risk considerations. The return on common equity of 14.0% allowed in this case is 150 basic points less than the 15.5% rate of return N.C.N.G. was allowed in its last general rate case. This reduction of almost 10% in the Company's allowed rate of return reflects consideration of the risk factors discussed above.

[6] All the factors set out in the Commission's order properly bear on its common equity rate of return determination. There is no factor set out which the Commission, as a matter of law, improperly considered. The Public Staff argues that the law precludes the Commission from considering any increased risk to NCNG investors caused by the possible loss of customers who may switch to alternative fuels. We disagree. Consideration of this kind of risk factor lies clearly within the ambit of the Commission's ratemaking expertise.

[7] The Public Staff next contends the Commission improperly considered the fact that NCNG is "a small but efficient and well-managed natural gas utility." Again we disagree. First, it is clear from its order that the Commission gave little, if any, weight either to the fact that NCNG was small or that it was well managed and efficient. The Commission mentioned these facts in its assessment of the risk an NCNG investor might incur. The sense of the Commission's order is that the utility's small size in-

creases, but its efficient management reduces, the risk. With regard to investor risk, therefore, the two factors tend to cancel each other.

Second, the law permits the Commission to consider both size and management in assessing investor risk insofar as such risk may bear on an appropriate return on equity capital. A utility's small size may increase investor risk and justify a higher return. See *Utilities Comm. v. Telephone Co.*, 298 N.C. at 178-79, 257 S.E. 2d at 634-35 (Commission relied on expert testimony that utility's small size justified the addition of a "risk premium of 2 to 3%" in setting a proper return on equity capital). Every utility has a duty to be well managed and "furnish adequate, efficient and reasonable service." N.C.G.S. § 62-131(b) (1982 Repl. Vol.). This Court has not questioned "the necessity for the Utilities Commission to take into account the efficiency of the company's operations in fixing its rates in a general rate case . . . ." *State ex rel. Utilities Commission v. Public Staff*, 309 N.C. 195, 209, 306 S.E. 2d 435, 443 (1983). Inadequate service because of inefficient management may justify a lower rate of return. *Utilities Comm. v. Telephone Co.*, 285 N.C. at 679-80, 208 S.E. 2d at 686-87.

While efficient management should not justify a higher common equity rate of return, it is appropriate for the Commission to consider good management as a factor which reduces investor risk and militates in favor of a lower return on equity capital. When the Commission's mention of this factor is read in context, it is clear that this is the impetus the Commission gave to it. The Commission considered NCNG's being well-managed as a counterbalance to its being small, as reducing investor risk, and as militating toward a lower, not a higher, rate of return on common equity.

Considering the highly subjective and judgmental process by which a common equity rate of return determination must ultimately be made and the Commission's obviously heavy reliance on witness Evans' testimony, we hold the Commission's decision on this issue is within the latitude permitted to it by the law and is supported by substantial, competent evidence in light of the whole record.

### III.

[8] Public Staff also argues the Commission erred in denying its motion for, and not making, more specific findings to support its return on equity conclusion. More specifically, Public Staff contends the "Commission's rate of return findings and conclusions include general statements of law and a mere recital of the parties' contentions. . . . This does not satisfy G.S. 62-79(a) and . . . case law principles." NCNG counters, claiming the Commission's order satisfies the requirements of NCNG § 62-79(a). We agree with NCNG.

N.C.G.S. § 62-79(a) provides:

All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:

(1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and

(2) The appropriate rule, order, sanction, relief or statement of denial thereof.

We have interpreted this statute as requiring the Commission to find all facts essential to a determination of the question at issue. *State ex rel. Utilities Comm. v. Eddleman,* 320 N.C. at 351, 358 S.E. 2d at 345 (quoting *State ex rel. Utilities Comm. v. Haywood Electric Membership Corp.,* 260 N.C. 59, 64, 131 S.E. 2d 865, 868 (1963)); *State ex rel. Utilities Comm. v. Edmisten,* 314 N.C. 122, 151, 333 S.E. 2d 453, 471 (1985), *vacated on other grounds sub nom. Nantahala Power & Light Co. v. Thornburg,* 477 U.S. 902 (1985). In addition, "[t]he [Commission's] failure to include all the necessary findings of fact is an error of law and a basis for remand upon N.C.G.S. § 62-94(b)(4) because it frustrates appellate review." *State ex rel. Utilities Comm. v. The Public Staff,* 317 N.C. 26, 34, 343 S.E. 2d 898, 904 (1986); *accord State ex rel. Utilities Comm. v. AT&T Communications,* 321 N.C. 586, 588, 364 S.E. 2d 386, 387 (1988) (per curiam); *State ex rel. Utilities Comm. v. Public Staff,* 322 N.C. at 699, 370 S.E. 2d at 573 (quoting *State ex rel. Utilities Comm. v. The Public Staff,* 317 N.C. 26, 34, 343 S.E. 2d 898, 904 (1986)). The Commission, however, is not re-

quired to "comment upon 'every single fact or item of evidence presented by the parties.'" *State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. at 351, 358 S.E. 2d at 345 (quoting *State ex rel. Utilities Comm. v. Nantahala Power & Light Co.*, 313 N.C. 614, 745, 332 S.E. 2d 397, 474 (1985), *rev'd on other grounds*, 476 U.S. 953 (1986) ). Moreover, "[t]he Commission's summary of the appellant's argument and its rejection of the same is sufficient to enable the reviewing court to ascertain the controverted questions presented in the proceeding. That is all that G.S. § 62-79 requires." *State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. at 351, 358 S.E. 2d at 345 (quoting *State ex rel. Utilities Comm. v. Conservation Council*, 312 N.C. 59, 62, 320 S.E. 2d 679, 682 (1984) ). We recently held that § 62-79(a) is violated when the Commission's finding of a return on equity failed "to make specific findings showing what effect, if any, it gave to financing costs . . . in arriving at its common equity rate of return decision." *State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. at 701, 370 S.E. 2d at 574.

With these principles in mind, we hold the Commission did comply with N.C.G.S. § 62-79(a). The Commission's order makes clear that it surpassed the minimal requirements we set out in *Conservation Council. See Conservation Council*, 312 N.C. at 62, 320 S.E. 2d at 682. Here the Commission did not merely summarize the arguments of the parties and then reject those offered by appellants. By contrast, the Commission considered and necessarily gave greater weight to Public Staff's evidence, which attempted to support a 13.3% rate of return, than to NCNG's evidence, which attempted to support a 16.5% rate of return. Public Staff's evidence was neither rejected nor ignored, but it was, instead, given substantial weight in the Commission's ultimate conclusion. More pertinently to the question under consideration, the Commission here did array those factors suggesting a higher rate of return against those suggesting a lower rate.

The facts here are unlike those presented in *Public Staff*, in which we held the Commission's order did violate N.C.G.S. § 62-79(a). *Public Staff*, 322 N.C. at 701, 370 S.E. 2d at 574. In that case the Commission failed to specify the extent to which specifically quantifiable financing costs affected the ultimate rate of return approved. *Id.* at 700, 370 S.E. 2d at 574. Here *Public*

*Staff* does not contend that there is some objectively quantifiable factor which the Commission improperly considered or failed to consider. Instead, the Public Staff insists that the Commission must "show[ ] the weight (i.e., the specific effect) of each factor affecting rate of return . . . ." We agree with the Commission, at least in the absence of a factor like that present in *Public Staff,* "that the determination of a reasonable rate of return is, in the end, basically a matter of sound regulatory judgment." Given this subjectivity ordinarily inherent in the determination of a proper rate of return on common equity, there are inevitably pertinent factors which are properly taken into account but which cannot be quantified with the kind of specificity here demanded by Public Staff. *See, e.g., id.* at 697, 370 S.E. 2d at 572; J. C. Bonright, A. L. Danielson & D. R. Kamerschen, *Principles of Public Utility Rates* 314-17 (1988); C. F. Phillips, Jr., *The Regulation of Public Utilities* 363-65 (1984).

We conclude, on this record, that the Commission's order is sufficiently detailed and specific, and its findings in support of its conclusion are adequate enough, to comply with the requirements of N.C.G.S. § 62-79(a).

IV.

[9] The Cities argue the Commission has not adequately, through appropriate findings supported by evidence, justified the differences in the rates of return for Cities as compared to NCNG's other customer classes.[12] Cities contend that without

---

12. In order to properly address the Cities' argument we think it helpful to review again what "rates of return" represent and how they can be determined for each class of customers. The "rate of return" is a percentage which the Commission concludes should be earned on the rate base. *See* N.C.G.S. § 62-133(b)(4) (1982 Repl. Vol. & 1988 Cum. Supp.). The "rate base" is the undepreciated historical cost of the utility's property which is used and useful in providing service to the public. *See* N.C.G.S. § 62-133(b)(1) (1982 Repl. Vol. & 1988 Cum. Supp.).

As we explained in *State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.,* 323 N.C. at 244-45, 372 S.E. 2d at 696:

Determining the effective rate of return for a particular NCNG customer class involves a mathematical computation containing several components. The computation must be performed after the fact by utilizing the financial information for a given test year with adjustments made for any subsequent increase in rates. There are in the computation three basic components which must be ascertained. First, an allocation must be made to determine the portion of the

such justification these differences amount to unreasonably discriminatory rates which violate § 62-140(a).[13] We disagree.

We outlined the relevant law in this area in *State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.*, 313 N.C. 215, 222, 328 S.E. 2d 264, 269 (1985), when we noted:

> A substantial difference in service or conditions must exist to justify a difference in rates. "There must be no *unreasonable* discrimination between those receiving the same kind and degree of service." While decisions of the Commission involving the exercise of its discretion in fixing rates are accorded great deference, the Commission has no power to authorize rates that result in unreasonable and unjust discrimination. In determining whether rate differences constitute unreasonable discrimination, a number of factors should be considered: "(1) quantity of use, (2) time of use, (3) manner of service, and (4) costs of rendering the two services." Other factors to be considered include "competitive conditions, consumption characteristics of the several classes and the value of service to each class, which is indicated to some extent by the cost of alternate fuels available."

*Id.* (citations omitted).

---

total rate base applicable to each customer class. Likewise an allocation, . . . must be made to determine the cost of service or operating expenses applicable to each customer class. Finally, the revenues NCNG collected from each customer class for the test period, adjusted for any subsequent increase in rates, must also be determined. Once all of the components have been agreed upon the computation itself is not complicated. The formula for determining the rate of return for each class is as follows: Operating revenues less cost of service (operating expenses and taxes) divided by the rate base equals the rate of return. Thus, the rate of return for any particular customer class varies inversely with the amount of the rate base and the amount of the cost of service, and directly with the amount of revenues, allocated to that customer class.

*Id.* at 244-45, 372 S.E. 2d at 696.

13. This statute provides, in pertinent part:

No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service.

N.C.G.S. § 62-140(a) (1982 Repl. Vol. & 1988 Cum. Supp.).

With these principles in mind, we emphasize at the outset that this Court has recently considered Cities' discrimination argument in the context of NCNG's prior rate proceeding. *See State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.,* 323 N.C. at 242-52, 372 S.E. 2d at 694-700. The Cities' present contentions are substantially the same as those made in *Carolina Utility Customers Assoc.,* where we held:

> [T]he Commission's ORDER does contain findings sufficient to justify its conclusion that the approved rates of return are just and reasonable and do not unreasonably discriminate among the various classes of NCNG customers. . . . While an assessment of the Commission's ORDER based simply on the cost of service evidence might suggest the adopted rates are unreasonably discriminatory, the Commission's analysis of the noncost factors permitted in our case law is sufficient to justify the Commission's decision.

*Id.* at 251-52, 372 S.E. 2d at 700.

The record now before us originates from the 27 March 1986 application filed by NCNG for authority to adjust its rates and charges. NCNG claims to have filed the present rate case primarily to recover the annual operating and capital costs of its new LNG Plant. Over 75% of NCNG's $8,193,100 request as revised was to recover cost of the LNG Plant while most of the remaining requested increase was claimed to be attributable to shrinking margins on negotiated sales and reduced total sales caused by low oil prices. After taking evidence and making findings, the Commission approved an increase of $5,956,540 in annual gross revenues. This increase necessarily required an adjustment to NCNG's schedules of rates and charges for customer classes. Essentially all of NCNG's customer classes received a rate increase.[14] Cities' rates were increased by 6.0%.[15] Notably, Carolina Customers Association, Inc. (CUCA), the Aluminum Company of

---

14. Only Rate Schedule 5A—Boiler Fuel Non-IST customers, and Rate Schedule 6A—Large Boiler Fuel Non-IST customers were decreased by 0.2% and 4.4%, respectively.

15. Other customer rate increases included: Residential Rate Schedule 1 was increased by 15.9%; Commercial Rate Schedule 2 was increased by 5.9%; and Industrial Rate Schedules 3A, 3B, and 4A were increased by 0.9%, 0.5% and 1.7%, respectively.

America (Alcoa), and Public Staff all intervened in the proceeding, but only Cities has brought an appeal claiming the newly set rates are discriminatory. Cities continue to argue that the discrimination in the rates of return among NCNG's several customer classes approved by the Commission are not justified by adequate findings supported by the whole record; therefore, by approving them the Commission exceeded its statutory authority. Appellees counter the evidence and findings adequately justify that the approved rates do not unreasonably discriminate among NCNG's classes of customers.

The Commission's order in this proceeding does address the discrimination issue presented by Cities. The Commission's ultimate conclusion on the discrimination issue is:

> It would be unjust and unreasonable to establish rates in this proceeding based upon equalized rates of return for all customer classes. Other relevant factors which must be considered in setting rates in addition to the estimated cost of service include the ability to negotiate rates, value of service, quantity of natural gas used, the time of use, the manner of use, the equipment which NCNG must provide and maintain in order to meet the requirements of its customers, competitive conditions, and consumption characteristics.

In support of this conclusion the Commission relied upon the following evidence, findings of fact and conclusions of law:

> First, the Commission was of the opinion

> the cost-of-service studies presented by the various parties are certainly an important and relevant guide or factor to be weighed in designing rates in this proceeding. Nevertheless, it must be kept in mind that the cost-of-service studies presented in this docket are not objective in nature, but rather reflect the preparer's judgment as to how to fairly allocate common costs among customer classes, as well as being based on numerous assumptions.

As an example, the Commission referred to the testimony and exhibits of Public Staff witness Davis who used two different methodologies for his four cost-of-service studies with widely divergent results. Witness Davis testified that while "these studies are useful tools in assisting with the design of rates, but

since it is a judgmental study, it should not be used solely to determine the magnitude of adjustments to rates."

Second, the Commission concluded that there are several other factors or ratemaking principles in addition to cost of service to consider in designing rates for natural gas utilities. The Commission lists the following factors:

(1) the value of service to the customer; (2) the type and priority of service received by the customer and, if the service is interruptible, the frequency of interruptions; (3) the quantity of use; (4) the time of use; (5) the manner of service; (6) the competitive conditions in the market place related to the acquisition of new customers; (7) the historic rate differentials between the various classes of customers; (8) the revenue stability to the utility; and (9) the economic and political factors which are inherent in the ratemaking process.

The Commission's order does not specifically address each of these interrelated factors seriatim. The order does, however, set forth evidence, findings of fact, and conclusions of law which demonstrate that the Commission gave consideration to each of these factors and their applicability to each customer class. This evidence and findings as they relate to appellant Cities include the following:

First, the Commission found that 33% of NCNG's sales to Cities is being made at negotiated rates due to the alternate fuel capability of some industrial customers served by Cities. The Commission concluded that this factor makes Cities a greater business risk to NCNG than those residential, industrial and commercial customers who do not have fuel-switching ability and cannot negotiate their rates. Because those industrial customers with alternative fuel capabilities are generally large consumers of natural gas, the impact of losing such a customer far exceeds the impact of any one residential or small industrial or commercial customer leaving the system. The Commission concludes that this increased risk associated with serving a substantial industrial market indirectly through Rate RE-1 and Rate SM-1 favors a higher rate of return for these Rate Schedules.

Second, the Commission found many of the rate base's capital costs allocated to Cities are substantially below those of residen-

tial and commercial customers. Capital costs allocated to the
Cities were incurred by NCNG twenty-five to thirty years ago
when the original transmission lines were constructed. Those
facilities have low original costs and are substantially depreci-
ated. Since more of the recent capital costs are allocated to
residential and commercial customers, they suffer the brunt of
the post-1973 inflation in those costs. The Commission considered
this to be a legitimate difference between customers, which
should be taken into account in setting rates, since cost-of-service
studies are not adjusted for dollars of unequal purchasing power.

Third, Cities' priority of service also played a part in the
Commission's decision to maintain Cities' rate of return above the
overall system rate of return according to the cost-of-service
studies. The Commission found that Cities have the same priori-
ties of service assigned to their different classes of users as
NCNG has for its ratepayers. When NCNG interrupts service to a
given class of its customers, Cities must likewise interrupt serv-
ice to their comparable class of users. Cities' mix of customers
having different priorities of service is unlike NCNG's mix of
customers having different priorities. The Schedule RE-1 rate is
intended to reflect an adjustment to the price charged to Cities to
compensate for this discrepancy. This factor is not captured in a
cost-of-service study.

Last, but perhaps most important, the Commission reviewed
and compared the rate differentials between NCNG's various
classes of customers to justify the rate of return differentials
presently approved and an increase in Cities' rates. The Commis-
sion found that a larger percentage increase was being imposed
on the majority of NCNG customers in this proceeding than is be-
ing imposed on Cities, even though the majority of NCNG's
customers are residential just as the majority of Cities' users are
residential. More specifically, the Commission found Cities' Rate
Schedule RE-1 has been increased in this case by 6.0% while
residential Rate Schedule 1 has been increased by 15.9%. Fur-
thermore, NCNG proposed to increase Schedule RE-1 by 8.74% as
part of a 6.45% overall increase, and appellant Public Staff pro-
posed to increase Schedule RE-1 by 5.38% as part of a 4.11%
overall increase. The Commission concluded that by adopting a
6.0% increase for Schedule RE-1 as part of a 4.72% overall in-
crease "the rate design approved by this proceeding does not

unreasonably discriminate against the Cities after weighing and balancing all of the relevant factors discussed by the Supreme Court in the *Textile Manufacturers'* opinion."

As noted previously the basis of Cities' argument is essentially the same as that set forth in *Carolina Utility Customers Assoc. Id.* at 242, 372 S.E. 2d at 694-95. Cities again contend that the Commission has failed to adequately justify the discrimination against RE-1 customers that is present in NCNG's rate structure. As we noted in our prior decision:

> We are cognizant of the cogent arguments made by appellants that the differences relied on by the Commission in approving NCNG's rate schedules do not justify the discriminations in rates of return so as to make them reasonable discriminations. Appellees argue with equal cogency to the contrary. Both sets of arguments are essentially fact based and are more properly made to the Commission than to this Court. The Commission has . . . supported its conclusions on the discrimination issue with evidentially supported factual findings that it has determined in its administrative expertise *do* justify the discriminations it has approved. It is not this Court's duty to evaluate the accuracy of complex statistical models, conflicting methodologies, and the opposing expert opinions drawn therefrom. This, instead, is the duty of the Commission which has special knowledge, experience and training best suited to make such determinations.

*Id.* at 251, 372 S.E. 2d at 699-700. So it is here.

We note as particularly significant the testimony and exhibits of NCNG witness Teele which show that if Cities were required to bear fully their share of the allocation of the LNG Plant costs, Cities' rates would have increased by 7.4%. The Commission concluded NCNG's proposed allocation of these costs as described by Teele "were just and reasonable" and Cities do not contest this conclusion on appeal. The Commission, however, imposed only a 6.0% increase in Cities' rates. The Commission, therefore, lessened the impact of the LNG Plant costs insofar as it affected Cities' rates, thereby moving Cities' rates closer to the company-wide overall rate of return and Cities' estimated cost of service.

In addition, the cost of service studies presented by Teele, Public Staff witness Davis, and Cities' witness Kersten, all demonstrate that under NCNG's proposed rate increase none of NCNG's customer classes, including the residentials, yield revenues below the estimated cost of serving them. While we cannot ascertain it with certainty on this record, it appears that the same holds true as to the rates actually approved by the Commission. Although there are still significant disparities in rates of return between the various customer classes, the rates set for each customer class produce revenues in excess of the operating costs allocable to that class.

There is, in short, far less actual discrimination among NCNG's customer classes in the rates approved here than there was in the rates approved in *Carolina Utility Customers Assoc.* Since we concluded the rates approved in *Carolina Utility Customers Assoc.* were not unreasonably discriminatory, it follows that those approved here must not be.

After a careful review of the record we hold the Commission's order does contain findings sufficient to justify its conclusion that the approved rates of return are just and reasonable and do not unreasonably discriminate against Cities. Furthermore, the Commission's findings are supported by substantial evidence in view of the whole record.

In conclusion and for the reasons stated, we hold that the Commission did not err in this proceeding. Its order is, therefore,

Affirmed.

Justice MEYER dissenting.

I dissent for the reasons stated in my dissenting opinion in *State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.*, 323 N.C. 238, 372 S.E. 2d 692 (1988), i.e., for the failure of the Commission to justify and quantify the magnitude of the variances dictated by the non-cost factors upon which it relied to justify the rate discrimination which it approved.

The majority is apparently satisfied that the Commission has taken to heart our admonition and is moving progressively, though at a painfully slow pace, to eliminate or significantly

reduce the substantial discrimination between the various classes of customers caused by the subsidization of certain classes of customers by other classes and the very substantial difference between the rate of return for the various classes of customers approved by the Commission and those which would be dictated by cost-of-service studies. As to the cities in particular, while it is true that in the two most recent NCNG rate cases, the Commission has placed all or most of the rate increases on the classes other than the municipal customers, I believe faster progress toward the goal is warranted.

I also join Justice Martin's dissenting opinion as to the Commission's rewarding the company through the rate structure for the standard of management required of it by the General Statutes.

I vote to reverse the Commission's order or to remand the case for reconsideration of the issues of rate discrimination and rate of return on common equity.

Justice MARTIN dissenting.

I respectfully dissent from the holding of the majority approving the 14.0 percent rate of return on common equity set by the Commission.

The majority seeks to dismiss the Commission's reliance upon the factor "NCNG's efficiency and good management." This Court has no way of knowing the relative weight or consideration that the Commission gave to the various factors upon which it based its conclusion; it may very well have given most reliance to the efficiency factor. In other areas of the law where the fact finder relies upon an improper factor, a new hearing is ordered. *Cf. State v. Zuniga*, 320 N.C. 233, 357 S.E. 2d 898 (1987); *State v. Cameron*, 314 N.C. 516, 335 S.E. 2d 9 (1985); N.C.G.S. § 150B-51(b) (1987). Here the Court is applying the whole record test, not the any competent evidence test. N.C.G.S. § 62-94(b)(5) (1982). The question is whether the net effect of all the record evidence provides substantial support for the findings and decision.

That NCNG is "efficient and well-managed" is certainly commendable, and many other utilities could profit by its example; however, this fact should not be considered by the Commission in

determining a proper rate of return. NCNG has a statutory duty to operate in an efficient and well-managed manner. N.C.G.S. § 62-131(b) (1982). Inadequate service because of *inefficient* management is a proper consideration for a *lower* rate of return. *Utilities Comm. v. Telephone Co.*, 285 N.C. 671, 208 S.E. 2d 681 (1974). This is appropriate because the utility has failed to fulfill its statutory duty. Further, this finding is inconsistent with the duty of the Commission to set rates as low as constitutionally possible. *Utilities Comm. v. Power Co.*, 285 N.C. 377, 206 S.E. 2d 269 (1974). Any savings due to efficient management should be passed on to ratepayers, not shareholders. The rate of return is tied to the duty of the utility to operate in an efficient fashion. N.C.G.S. § 62-133(b)(4) (Cum. Supp. 1988).

Further, the majority contends that the Commission "gave little, if any, weight either to the fact that NCNG was small or that it was well managed and efficient." As already stated, this Court has no way of knowing what weight the Commission gave to the various factors that it relied upon, except as set out by the Commission itself. Here the Commission wrote with respect to this factor: "The Commission recognizes that N.C.N.G. is a small but efficient and well-managed natural gas utility and, *in recognition thereof,* has authorized an appropriate rate of return in this proceeding which is consistent with such fact . . . ." (Emphasis added.) Thus it is clear from the Commission's own words that it authorized the rate of return based upon the "small and efficient" factor.

The majority relies upon *Utilities Comm. v. Telephone Co.*, 298 N.C. 162, 257 S.E. 2d 623, where this Court stated that a "small utility like Mebane" posed greater risks for the investor. *Telephone Co.* is not applicable where the utility is small but also well managed and efficient, because there is no increased risk to the shareholders.

Inexplicably, the majority then holds that the Commission only considered the efficiency factor for the purpose of supporting a *lower* rate, thereby destroying the credibility of its reliance upon *Telephone Co.*

Finally, the majority concedes that the setting of a common equity rate of return is "highly subjective and judgmental." This is, indeed, the best argument to prohibit the Commission from

relying upon inappropriate factors in this process. Such prohibition will reduce the subjectivity of the Commission's task.

I vote to remand this case to the Commission for a new determination of the equity rate of return without regard to the size of NCNG or the fact that it is efficient and well managed.

Justice MEYER joins in this dissenting opinion.