IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 



ON MOTION FOR REHEARING


 




NO. 3-90-084-CV





PUBLIC UTILITY COMMISSION OF TEXAS,


STATE PURCHASING AND GENERAL SERVICES COMMISSION,


OFFICE OF PUBLIC UTILITY COUNSEL AND


CITIES OF ABERNATHY, ET AL.,



 APPELLANTS


vs.





GTE-SW,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT



NO. 406,115, HONORABLE JOSEPH H. HART, JUDGE PRESIDING




 





 We withdraw our previous opinion, handed down June 19,
1991, and substitute this opinion in order to respond more
conveniently to matters raised in the parties' motions for
rehearing, which we hereby overrule.

 In a suit for judicial review authorized by the Public
Utility Regulatory Act (PURA), Tex. Rev. Civ. Stat. Ann. art.
1446c, § 69 (Supp. 1991), the district court affirmed in part and
reversed in part a final order issued by the Public Utility
Commission in a rate proceeding, remanding the cause to the
Commission with instructions that it "take such action and enter
such orders as are consistent with" the district-court judgment. 
We affirm that part of the district-court judgment reversing the
Commission order. We reverse that judgment to the extent it
affirms the Commission's order. We remand the cause to the
district court with instructions that the cause be remanded to the
Commission for further proceedings not inconsistent with our
opinion.



THE CONTROVERSY


 In 1984, General Telephone Company of the Southwest
applied to the Commission for an order increasing the rates it is
permitted to charge its customers for intrastate telecommunication
services. PURA § 43. Several parties appeared in opposition to
the application. After an intervening lawsuit in district court,
and a subsequent appeal, involving certain aspects of the
controversy, the Commission concluded the contested case by a final
order dated April 7, 1989. The Commission order required the
Company to reduce its rates to the extent necessary to diminish its
annual revenues by about $59 million. The Commission purported to
make the new rates retroactive by assigning them an effective date
of January 1, 1987. To effectuate that element of the order, the
Commission required the Company to refund about $140 million to its
customers through credits on future invoices.

 After the Commission overruled various motions for
rehearing, numerous parties in the contested case sued for judicial
review of the order in the statutory cause of action authorized by
PURA § 69. The district court consolidated the several causes.
After final hearing, the court reversed that portion of the agency
order which required a refund but affirmed the remainder of the
order. Several litigants appeal to this Court: the Commission,
the Company, the State Purchasing and General Services Commission,
the Office of Public Utility Counsel, and 86 municipalities. (1)
 See
Texas Administrative Procedure and Texas Register Act (APTRA), Tex.
Rev. Civ. Stat. Ann. art. 6252-13a, §§ 19(e), 20 (Supp. 1991).

 The appellants assail, by various points of error, those
parts of the Commission order adverse to their respective
interests. We will discuss below the several points of error. To
assist in understanding our discussion, however, we should set out
first the general statutory context in which the Commission arrived
at its final order in the contested case.



RATEMAKING IN THE COMMISSION


 In PURA, the Legislature directed the Commission to
accomplish two objectives: (1) protect the public interest in
state-wide availability of an adequate, efficient, safe, and
reasonable telecommunications service; and (2) assure that the
rates charged and paid for such service are "just and reasonable." 
See PURA §§ 18(a), 35(a), 38. In PURA § 37, the Legislature
empowered the Commission to "fix and regulate" the rates a utility
charges for intrastate telecommunication services.

 The Legislature placed in the Commission a rather large
discretion in rate matters, if one looks only to certain broadly
worded provisions of PURA. For example, a telecommunications
utility must prove that any rates it proposes are "just and
reasonable," which is to say that they permit "a reasonable
opportunity to earn a reasonable return on . . . invested capital
. . . over and above . . . reasonable and necessary operating
expenses." PURA §§ 18(a), 39, 40. Concurrently with such broad
criteria, however, the Legislature circumscribed Commission
discretion by defining in PURA itself such essential terms as
"invested capital," "net income," and "expenses disallowed." PURA
§ 41. See generally Texas Alarm & Signal Ass'n v. Public Utility,
603 S.W.2d 766 (Tex. 1980); Southwestern Bell Tel. Co. v. Public
Utility Com'n, 571 S.W.2d 503 (Tex. 1978). 

 In addition, the Legislature directed the Commission to
consider specified factors in fixing the rates that a public
utility may charge. In PURA § 39(b), for example, the Legislature
required the Commission to "consider, in addition to other
applicable factors," several aspects of a utility's operations,
namely: "[the utility's] efforts to comply with the statewide
energy plan, the efforts and achievements of such utility in the
conservation of resources, the quality of the utility's services,
the efficiency of the utility's operations, and the quality of the
utility's management."

 Still other factors may become applicable from sources of
law outside PURA. The Constitution of the United States precludes,
of course, any rate that is "confiscatory" of the utility's
property. Public Service Com. v. Great Northern Util. Co., 289
U.S. 130, 135 (1933). And the Commission has provided by its own
regulations for the consideration of such additional factors as
inflation, deflation, service-area growth rate, and a utility's
need to attract new capital. 16 Tex. Admin. Code § 23.21(c)(1)(C)
(Supp. 1991). 

 We believe our observations in reference to a similar
statutory scheme apply to the rate-setting provisions of PURA. The
applicable law and facts may require "the Commission to ascertain
the existence, absence, and interaction of any number of factors. 
These factors may vary from case to case and time to time,
requiring perhaps a different orchestration in each instance."
Morgan Exp. v. Railroad Com'n of Texas, 749 S.W.2d 134, 137 (Tex.
App. 1987, writ denied). In view of the complexity inherent in the
subject-matter, "[w]asteful and fruitless attempts at perfection
are neither expected nor required" of the Commission. Id.



RATE OF RETURN


 The terms of PURA § 39(a) required the Commission to
calculate and fix the Company's charges to its customers according
to the Commission's determination of the level of "overall
revenues" necessary to permit the Company "a reasonable opportunity
to earn a reasonable return on" its rate base, or the "invested
capital used and useful in rendering service to the public over and
above its reasonable and necessary operating expenses." (2)
 See
generally Butler, The Rate of Return in Texas--The Neglected Issue,
28 Baylor L. Rev. 937, 938 (1976). 

 The Commission concluded that a rate of 11.05% would
yield a "reasonable return" within the meaning of PURA § 39(a). 
The Company challenges, on appeal, the Commission findings on which
the conclusion rests. These relate to only one criterion of what
constitutes a "reasonable return": whether the rate is sufficient
to yield a level of earnings that is high enough to attract new
capital from external sources. The Company's complaint pertains
even more narrowly to a single technique or method by which the
Commission might estimate a rate that is sufficient to attract new
capital: the "double leverage" method sometimes employed when the
capital stock of a utility is owned wholly by another corporation. 
See generally Foster, Fair Return Criteria and Estimation, 28
Baylor L. Rev. 883, 886-90 (1976).

 The evidence may be summarized by the following table
displaying the Company's capital structure and the 11.05% "cost of
capital" upon which the Commission's findings rest. The table,
which we have altered somewhat, is taken from the examiner's
proposal for decision, incorporated in the Commission's final
order:


COST OF CAPITAL--GTE SOUTHWEST CORPORATION


(After the Subsidiary Risk Adjustment)



 Amount Weighted

Component 000's Ratio Cost Cost 


Long-Term Debt $ 779,910 41.56% 10.01% 4.16%

Short-Term Debt  15,500   .83 7.54 .06

Preferred Stock  31,530 1.68 7.13 .12

Common Equity    1,049,517 55.93 11.99 6.71


Total 11.05%



While the remaining figures in the table appear to be actual
figures, the 11.99% "cost" for "common equity" (3)
 or common stock is
artificial, rendering artificial as well the 6.71% "weighted cost"
of that element and the resulting total of 11.05%, or the rate of
return arrived at by the Commission, in its final order, as a
"reasonable return."

 The artificial figure of 11.99% was derived from the
testimony of witnesses who explained their various expert opinions
of what a "reasonable return" would be, the figures ranging from
10.54% to 15.0%. Three witnesses buttressed or explained their
opinions by referring to the "double leverage" method of estimating
the "cost of capital" for a utility corporation when, as here, its
common stock is owned entirely by another corporation. That method
simply imputes to the utility a cost of "common equity" equal to
the parent corporation's total weighted cost of capital, based on
an assumption that the parent supplies that component of the
utility's capital from the aggregate of the parent's own capital
structure, and not any particular component thereof. See Foster,
supra, at 889. In the present case, for example, the capital
structure of the Company's parent, consisting of debt, preferred
stock, and "common equity" or common stock, was shown to have a
total weighted cost of 12.49%. The "double leverage" method of
estimating the Company's cost would have required that the 12.49%
be inserted in the table above as the Company's cost of "common
equity."

 The 11.05% rate of return selected by the Commission does
not result from this manner of using the "double leverage" method
of estimating cost of capital. The Commission employed instead the
theory of a witness who varied the "double leverage" method in
arriving at her opinion of the Company's cost of capital--she
reduced the parent corporation's total weighted cost of capital
(12.49%) to account for the fact that the Company was a public
utility with a diminished economic risk. While the Commission
adhered to the theory of a reduced economic risk, it did not merely
adopt the exact reduction or rate of return arrived at by the
witness. The Commission determined rather to reduce the 12.49% to
11.99% to account for the diminished economic risk (the latter
figure being shown in the table above). The ultimate 11.05% rate
of return follows from simple arithmetical calculations.

 The Company argues that the diminished-risk factor was
already reflected in the capital structure of its parent, in the
minds of investors, and thus in the 12.49% total weighted cost of
capital. Accordingly, any further reduction to account for the
diminished-risk factor amounted to a double reduction for the same
factor, an abuse of discretion requiring reversal of the
Commission's final order. APTRA § 19(e)(6). 

 We believe, however, that the argument misses the
essential point that both the "double leverage" method itself and
the theory of a reduction to account for the Company's diminished
economic risk were only instruments employed in estimating the
Company's hypothetical cost of capital in a situation in which the
Company's actual cost of capital would not serve the purpose of
determining the "reasonable return" required by PURA § 39(a). 

 The method and the reduction were neither required nor
prohibited by statute or regulation. No one was bound in a
statutory sense by the techniques employed by any expert witness or
a resulting opinion. For example, the several expert witnesses
gave their respective opinions that a proper hypothetical rate of
return on "common equity capital" for the Company was 15%, 12.1%,
10.85%, (4) and 10.54%, the last three being based, at least in part,
on the witness's use of the "double leverage" method. The figure
chosen by the Commission, 11.99%, was no more than the Commission's
own estimate converted into a finding, an estimate within the range
made by the testimony of the various expert witnesses. We hold the
Commission did not abuse its discretion.

 The Company argues next that the Commission acted
contrary to its established policy by making the diminished-risk
adjustment mentioned above. It is not suggested that the policy
was one of general applicability, laid down in a formal rule
previously promulgated by the Commission to govern in all cases of
a particular class. Rather, the policy is found, according to the
Company, in the Commission's own precedents in similar contested
cases. The Commission's unexplained departure from established
policy, the Company contends, also amounted to an abuse of
discretion. APTRA § 19(e)(6).

 We might accurately compare the circumstances in the
Company's case with those of the other contested cases referred to,
only if we had before us the agency record compiled in those other
cases. Those records are not before us, and were not before the
district court. Instead, the Company refers to so much of the
record in those cases as is reflected in a publication entitled
Public Utility Commission Bulletin. We have read the report of
those cases and other cases in the bulletin which indicate that the
Commission did make the adjustment mentioned. Given the resulting
doubt about whether such an administrative policy exists at all,
and the absence of any means of determining the similarity of the
other contested cases to the present case, we reject the Company's
argument. 

 In a separate point of error, the Company contends the
Commission's choice of 11.05%, as a rate sufficient to yield a
reasonable return, was "not reasonably supported by substantial
evidence of record." APTRA § 19(e)(5). The Company argues the
point jointly with its abuse-of-discretion complaint discussed
above. We believe the Company directs its separate point of error
at the absence of evidence explicitly supporting the Commission's
choice to reduce the 12.49% figure to exactly 11.99%, that is to
say, a want of evidence to support fixing the difference at
precisely .50%. The .50% difference is an inference from the body
of evidence on the point in question; none of the evidence
suggested that figure explicitly. It is, however, within the range
of the evidence received, as discussed above. 

 The "substantial evidence" test or rule refers simply to
"such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." Pierce v. Underwood, 487 U.S.
552, 563 (1988); Consolidated Edison Co. v. National L. R. Bd., 305
U.S. 197, 229 (1938); see generally K. Davis, Administrative Law
Text § 29.02, at 527-30 (3d ed. 1972); B. Schwartz, Administrative
Law, § 10.7, at 596-600 (2d ed. 1984). The Company suggests no
reason why the .50% difference is an unreasonable conclusion even
though it falls squarely within the range of conclusory inferences
that a reasoning mind might have drawn from the relevant evidence,
which included testimony that a reasonable rate of return to
"common equity" might range from 10.54% to 15%. No such reason
appears to us. 

 For the reasons given, we overrule the Company's two
points of error complaining of the rate of return.



PAYMENTS TO AFFILIATES


 As mentioned previously, PURA § 39(a) requires a rate of
return that will allow the Company to recoup "its reasonable and
necessary operating expenses" while simultaneously affording the
Company "a reasonable opportunity to earn a reasonable return on
its invested capital." The Commission included within the
Company's operating expenses the estimated amounts the Company will
pay two affiliate companies, GTE Directories and GTE Service
Corporation. The Cities complain on appeal that the Commission
erroneously included these sums in calculating the Company's
operating expenses and, by extension, its rate of return.

 Because operating expenses are limited to those that are
"reasonable and necessary," and because the sums paid between
affiliates might be fixed at something less than an arms-length
transaction, rational administration required the Commission to
scrutinize closely any sums the Company expected to pay its two
affiliates. See Hawes, Utility Holding Companies, at 10-1 (1984). 
The same principle is found in the terms of PURA § 41(c)(1). That
statute explicitly requires the Commission to exclude such expenses
"except to the extent that the [Commission] shall find such payment
to be reasonable and necessary for each item or class of items as
determined by the commission." Moreover, the statute spells out
the character of finding that the Commission must make before such
expenses may be included:



Any such finding shall include specific findings of the
reasonableness and necessity of each item or class of
items allowed and a finding that the price to the utility
is no higher than prices charged by the supplying
affiliate to its other affiliates or divisions for the
same item or class of items, or to unaffiliated persons
or corporations.



PURA § 41(c)(1). In other words, each finding that a payment to an
affiliate is "reasonable and necessary" must include subsidiary
findings: (1) that each item or class of items is "reasonable and
necessary"; and (2) that the price paid by the utility is no higher
than the prices charged to other specified purchasers.



GTE Directories


 The evidence showed that the Company made payments to GTE
Directories for the printing and publishing of the Company's
telephone directories. GTE Directories is an "affiliate" within
the meaning of PURA § 3(i)(4). (5)

 The Cities complain on appeal, in several respects, of
the Commission's inclusion of the Company's payments to GTE
Directories as "reasonable and necessary operating expenses." 
Specifically, they argue that the Commission's final order did not
contain the specific findings required by PURA § 41(c)(1).

 The sole relevant finding contained in the Commission's
final order is that numbered 16; no other finding pertains to the
Company's payments to GTE Directories. Finding of Fact 16 states
as follows:



The testimony of GTE witness Keys refutes the conclusion
that GTE Directories' agreement with GTE Southwest is
unfavorable in comparison with its other customers. It
would not be appropriate to adjust GTE Directories'
prices for return and tax components. Because the
matching principle would require ignoring the revenues
from the arrangement with GTE Directories if the expenses
are not allowed, the customers benefit from recognizing
the arrangement for rate-making purposes. Accordingly,
expenses of $19,400,000 and revenues of $47,416,000
should be included in the cost of service.



 While the foregoing purports to be a "finding," it hardly
determines anything at all except perhaps in the last sentence,
which concludes starkly, opaquely, and with surpassing generality
that the stated sums "should" be included in the Company's cost of
service. The balance of the finding declares merely that: (1) a
witness's testimony refutes any conclusion that the directory
agreement "is unfavorable in comparison with the [Company's] other
customers"; (2) any adjustment of the prices "would not be
appropriate"; and (3) the Company's "customers benefit from
recognizing the arrangement for rate-making purposes."

 We are instructed not to be "hypertechnical" in our
evaluation of whether an agency's findings comply with a statutory
mandate that the agency make findings of fact; and we are even told
that the "evidence and testimony" in a contested case amounts in
some manner to a sufficient finding of fact. State Banking Bd. v.
Allied Bank, 748 S.W.2d 447, 449 (Tex. 1988). We need not explore
these mysteries, however, for we cannot imagine a more flagrant
failure by an administrative agency to comply with the terms of its
governing statute. Absolutely nothing in the Commission's order
suggests the Commission attempted to include in its order what PURA
§ 41(c)(1) explicitly demands in the clearest and most imperative
language: (1) "specific findings of the reasonableness and
necessity" of the sums to be paid for directories; and (2) "a
finding that the price to the [Company] is no higher than prices
charged by [GTE Directories] to its other affiliates or divisions
for the same item or class of items, or to unaffiliated persons or
corporations." If a statute means anything at all, PURA § 41(c)(1)
required those specific findings before the affiliate payments
might be included, and the Commission did not make them in its
final order in this case.

 We therefore sustain the Cities' point of error. (6) See
APTRA § 19(e)(1).



GTE Service Corporation


 GTE Service Corporation is another subsidiary of GTE
Corporation, the parent company. Three divisions of GTE Service
Corporation charge its sister subsidiaries for various services it
provides them; they are: (1) "Telephone Operations Headquarters,"
or "Telops," which files interstate-access tariffs and supplies
certain planning and development services to those subsidiaries
that are telephone-operating companies, such as the Company here;
(2) "GTE Corporate Departments," which supplies to all affiliates
certain services such as consolidated accounting, treasury
services, and the preparation and filing of the parent's
consolidated tax return; and (3) "Diversified Products
Headquarters," which supplies services only to subsidiaries that
are not telephone-operating companies, such as GTE Communications
Systems and GTE Government Systems.

 The parties dispute exactly how GTE Service Corporation
charges its sister affiliates for its services. In general,
however, the charges are assessed only for services supplied: for
example, the Company receives services only from "Telops" and "GTE
Corporate Departments," but not from "Diversified Products
Headquarters," and pays accordingly. With this qualification, we
may refer hereafter to the amounts the Company pays its affiliate,
GTE Service Corporation. 

 The Cities assail the Commission's decision to include as
"reasonable and necessary operating expenses" the estimated sums
the Company will pay GTE Service Corporation, contending the
payments were unreasonable as a matter of law because the
allocation system employed by GTE Service Corporation results in a
disproportionate share of those expenses being borne by the
Company, and thus by its customers through the rates charged them. 
The Company disputes any contention that it pays more than a "fair
share" under the allocation system. We are unable to decide that
issue; it is a question for the Commission and not this court. But
the Cities raise an additional contention under PURA § 41(c)(1),
directed again at the Commission's failure to comply with the
statutory requirements of PURA § 41(c)(1).

 The Commission's Finding of Fact 13 is the sole finding,
in the final order, that refers to the Company's payments to GTE
Service Corporation. It states as follows:



GTE Service Corp provides to GTE Southwest the classes of
services described in section III.D.3.a of the Report. 
The testimony of the GTE witnesses summarized in section
III.D.3 of the Report establishes by a preponderance of
the evidence that (1) the allocation formula properly
reflects differences between the purchasing affiliates;
(2) the prices charged for each class of service are
reasonable relative to the cost of obtaining them from
alternative sources; and (3) the services are reasonable
and necessary for the provision of utility service. The
testimony of Mr. Gillespie establishes that $258,000
should be deducted as a disallowance of legislative
advocacy expenses and $268,000 should be deducted for
Signaling System 7, which is related to services that are
not being provided.



Finding of Fact 13 incorporates by reference the following
paragraph in the examiner's report:



Introduction--Four GTE witnesses discussed the operation
of GTE Service Corp and the allocation and direct billing
of its expenses to GTE Southwest. About $9,406,000 of
GTE Service Corp expenses were allocated to GTE
Southwest.


 [The report describes here the division of GTE
Service Corp. into three groups and summarizes the
functions of each group.] In general, the expenses of
corporate departments are allocable to all GTE
subsidiaries, the expenses of telops are allocable only
to telephone operating companies, and the expenses of
products and systems are allocable only to nontelephone
subsidiaries.



 As mentioned previously, PURA § 41(c)(1) requires the
exclusion of payments to an affiliate, from a utility's "reasonable
and necessary operating expenses," unless the Commission makes
these findings in its final order: a general finding that the
payments are "reasonable and necessary for each item or class of
items"; and specific findings that (1) each item or class of items
supplied by the affiliate is reasonable and necessary and (2) "the
price to the utility is no higher than prices charged by [the]
affiliate to its other affiliates or divisions for the same item or
class of items, or to unaffiliated persons or corporations."

 The Cities complain that the Commission did not make the
second specific finding -- a finding that the prices charged by GTE
Service Corporation to the Company were "no higher than prices
charged" other affiliates or unaffiliated persons or corporations
for the same item or class of items. As a result, the Cities
contend, the premise of PURA § 41(c)(1) required that the
Commission exclude from the rate calculation the Company's
estimated payments to its affiliate GTE Service Corporation. We
agree.

 If we assume that Finding of Fact 13 amounts to "specific
findings" that each item or class of items supplied by GTE Service
Corporation is reasonable and necessary (a matter we do not
decide), the fact remains that nothing therein purports to
determine that the prices charged the Company by GTE Service
Corporation are "no higher than" those charged by it to its other
affiliates or divisions, or unaffiliated persons or corporations. 
Instead, Finding of Fact 13 determines only that the prices charged
the Company by GTE Service Corporation are "reasonable relative to
the cost of obtaining them from alternative sources." This is not
the same thing. See APTRA § 19(e)(1).

 In its motion for rehearing, the Commission invites our
attention to section III.D.3.e. of the report, where the examiner
writes: "Accordingly, Mr. Bredeweg's testimony establishes that the
prices charged to GTE-Southwest were no higher than prices charged
to other subsidiaries." The Commission apparently argues that, by
mentioning a section of the examiner's report in a finding of fact,
it thereby adopts everything in that section of the report. We
disagree. PURA § 41(c)(1) requires specific findings that the
price charged to the utility is no higher than prices charged by
the supplying affiliate to its other affiliates or unrelated
entities. The Commission made no such finding here. A sentence in
the examiner's report, summarizing the opinion of a witness, will
not substitute for a Commission decision in the form of a finding,
particularly when there is no specific incorporation of the
examiner's report, when there is an actual finding dealing with the
subject, and when the actual finding does not satisfy the statutory
requirement.

 Nothing in the order explains the departure from what the
statute required; and, of course, the Commission was not free to
disobey the terms of its governing statute. We therefore sustain
the Cities' point of error. See APTRA § 19(e)(1).



HYPOTHETICAL FEDERAL INCOME TAX ALLOWANCE


 Federal income taxes incurred by a public utility are
recoverable as part of the company's operating expenses for
ratemaking purposes. Public Utility Com'n v. Houston Lighting, 748
S.W.2d 439, 441 (Tex. 1987), appeal dism'd, 488 U.S. 805 (1988);
Suburban Util. Corp. v. Public Util. Com'n, 652 S.W.2d 358, 363
(Tex. 1983). Public Counsel and the Cities contend the Commission
erroneously calculated the Company's federal-income-tax liability
in estimating its operating expenses. They contend the calculation
was erroneous in two respects: first, it did not include the
income-tax deductions actually taken by the Company for expenses
disallowed by PURA § 41(c)(3); second, it failed to account for a
pro-rata share of the tax savings realized by the Company by reason
of its parent's filing a consolidated tax return. Both tax-accounting practices, the Cities and Public Counsel assert, violate
the "actual taxes paid" formulation of Houston Lighting, 748 S.W.2d
at 442. We will sustain the point of error.



The Consolidated Income-Tax Return


 The Company's parent files a consolidated federal-income-
tax return on behalf of itself and its subsidiary companies. Not
all the subsidiaries are regulated utilities. Each subsidiary
furnishes the parent a return reflecting its particular federal-income-tax liability or absence thereof, which the parent uses to
compute the combined tax liability of all the participating
subsidiaries.

 A. The Statutory Requirements

 PURA § 41(c)(2) requires for rate-calculation purposes
that a utility which is a subsidiary of a holding company compute
its federal-income-tax expense as follows:



If the public utility is a member of an affiliated group
that is eligible to file a consolidated income tax
return, and if it is advantageous to the public utility
to do so, income taxes shall be computed as though a
consolidated return had been so filed and the utility had
realized its fair share of the savings resulting from the
consolidated return, unless it is shown to the
satisfaction of the regulatory authority that it was
reasonable to choose not to consolidate returns. The
amounts of income taxes saved by a consolidated group of
which a public utility is a member by reason of the
elimination in the consolidated return of the
intercompany profit on purchases by the public utility
from an affiliate shall be applied to reduce the cost of
the property or services so purchased. The investment
tax credit allowed against federal income taxes, to the
extent retained by the utility, shall be applied as a
reduction in the rate based contribution of the assets to
which such credit applies, to the extent and at such rate
as allowed by the Internal Revenue Code.



 We have not found, nor has any party pointed out to us,
a Texas decision construing PURA § 41(c)(2). We believe, however,
that § 41(c)(2) contains three separate requirements. Firstly,
upon showings that the utility is a member of an affiliated group
eligible to file a consolidated income-tax return and that it would
be advantageous to do so, the Commission must (1) compute the
utility's income taxes as though it had filed a consolidated
return, and (2) impute to the utility its fair share of tax
savings. Secondly, any taxes saved by the consolidated group
because of the elimination of the intercompany profit on purchases
by the utility from an affiliate must be applied to reduce the
costs of the services or property purchased. Thirdly, any
investment-tax credit retained by the utility must be applied as a
reduction in the rate-based contribution of the asset to which the
credit applies. Each part of the statute must be given effect. See
Perkins v. State, 367 S.W.2d 140, 147 (Tex. 1963). Therefore, the
statute imposes three distinct duties on the Commission.

 B. The Commission's Findings

 The Company argues that the Commission satisfied the
requirements of PURA § 41(c)(2). The Cities and Public Counsel
contend, however, that the Commission calculated the Company's
income-tax expense on the basis of a hypothetical individual tax
return when a consolidated return would have yielded the Company
certain tax savings associated with the parent's investment in non-regulated businesses. Thus, the Company's customers were denied
the benefit of such savings in violation of PURA § 41(c)(2) and
Houston Lighting. The relevant finding by the Commission declared:



FF 12. The evidence establishes that GTE Southwest
properly accounts for the benefits from filing a
consolidated tax return with the GTE affiliates: (1) its
purchases from GTE Communications Systems are subject to
intercompany profit elimination, (2) it amortizes
investment tax credits over the life of the related
plant, and (3) GTE Corp's consolidation method properly
assigns tax losses and tax benefits to the sources of
income or losses that gave rise to the tax or benefit.



The Commission's order also contains the following "Conclusion of
Law," as well as several other "Conclusions of Law" that we have
set out in a footnote: (7)



CL 11. Because the benefits of the consolidated tax
return are properly accounted for in GTE Southwest's
invested-capital and cost-of-service accounts, the
staff's model calculates the proper allowance for the
company's federal income tax expense in accordance with
section 41(c)(2) of PURA without a separate adjustment
for consolidated tax savings.



 Appended to the final order is "Schedule V." It appears
to represent federal-income-tax expenses used in calculating the
Company's rates. (8)
 The table indicates that the Commission made no
adjustment to reflect the difference between the tax liability
shown on the Company's individual return and that of the
consolidated return.

 The various conclusions of law and the one conclusion
labeled a finding of fact, augmented by "Schedule V," amount to
only one essential determination by the Commission: an opaque
generality that the Company "properly accounts for the benefits
from filing a consolidated tax return with the GTE affiliates." 
This does not conform to PURA § 41(c)(2), which explicitly requires
a determination of whether any tax savings would result from a
consolidated return; and if so, an inclusion of a fair share of
that savings in computing the Company's operating expenses, in
order that the savings might be passed on to customers in the form
of a lower rate.

 The Company calls our attention to Finding of Fact 72,
which says, "For the reasons stated in section III.B. (9) of the
Examiner's Report, GTE-Southwest's federal income tax should not be
adjusted for consolidated tax savings." We do not believe that the
examiner's report satisfies the requirements of PURA § 41(c)(2). 
Although the report states that "the GTE consolidated return
provides GTE-Southwest its `fair share of savings,'" the
administrative law judge limited his understanding of consolidation
to the elimination of intercompany profit and amortization of
investment tax credits. He refused to reduce the Company's tax
expense by the losses of unregulated affiliates because he
perceived a violation of the normalization rules. We do not agree
that the normalization rules preclude consideration of the losses
of unregulated affiliates, as we will discuss below. Because the
administrative law judge ignored the first sentence of PURA
§ 41(c)(2), the examiner's report will not satisfy the statutory
requirements. (10)

 C. Normalization Issues

 Once the Commission computes a utility's income taxes as
though a consolidated return had been filed, the statute directs
the Commission to impute to the utility its "fair share of the
savings resulting from the consolidated return." PURA § 41(c)(2). 
The statute does not define the expression "fair share," but the
supreme court has held that any tax savings actually enjoyed by a
utility "should inure to the benefit of its ratepayers." Houston
Lighting, 748 S.W.2d at 442. To effectuate that principle, in a
case in which the utility had actually obtained a tax savings,
Houston Lighting required application of the corollary that "(t)he
utility's rates must reflect the tax liability actually incurred"
in lieu of any greater, hypothetical tax liability that might
plausibly be constructed in the circumstances. (11)
 Id.; see also
Federal Power Com'n v. United Gas Pipeline Co., 386 U.S. 237, 244
(1967); Suburban Utility, 652 S.W.2d at 362-64.

 The Company argues on appeal that the "actual taxes paid"
corollary of Houston Lighting violates the "normalization"
requirement of the Internal Revenue Code and the Commission's
substantive rules regarding that subject. See 26 U.S.C.A.
§§ 167(1)(3)(G), 168(i)(9) (Supp. 1990); 16 T.A.C. 23.21(b)(1)(D)
(Supp. 1991). The Company would avoid the effect of the corollary,
in the present case, on that basis. We should first determine
whether the "actual taxes paid" corollary of Houston Lighting
conflicts with the "normalization" requirement of the statute and
rule.

 The "normalization" requirement is one element of rate
calculation. The Commission's rule 23.21(b) requires that a
utility's "cost of service" include, for rate-calculation purposes,
"[f]ederal income taxes on a normalized basis" and that such taxes
"be computed according to the provisions of" PURA. Nothing in PURA
or the Commission's rules elaborates on "normalization." It
appears, however, that "normalization" refers to the technique by
which utilities are positively encouraged to seek income-tax
savings that may ultimately inure to the benefit of ratepayers,
even though the benefit does not inure immediately. Simply stated,
a utility is authorized to depreciate its capital assets at an
accelerated rate and calculate its actual income-tax liability
accordingly; for rate-calculation purposes, however, the utility is
authorized to depreciate the same assets on a straight-line basis. 
The resulting difference is accumulated in a deferred-tax account
that the Commission may ultimately divide, on an equitable basis,
between the utility and its customers. See PURA 27(e); Warren, Tax
Accounting in Regulated Industries: Limitations on Rate Base
Exclusions, 31 Rutgers L. Rev. 187, 187-194 (1978).

 "Normalization" under the Internal Revenue Code and the
Commission's rules purports to authorize the use of a fictitious
depreciation expense for rate-calculation purposes: the expense is
determined on a straight-line basis for rate-calculation purposes
even though the utility determines the expense on an accelerated
basis in calculating its actual income-tax liability. But this
does not mean that the holding in Houston Lighting contradicts the
"normalization" requirement; rather, it means that the corollary of
that decision does so. In Houston Lighting, the "actual taxes
paid" corollary was necessary to effectuate the principle laid down
in the holding in that decision: the tax savings actually enjoyed
by a utility "should inure to the benefit of the ratepayers." See
Houston Lighting, 748 S.W.2d at 442. The "normalization"
requirement effectuates that principle in a different way: by
encouraging utilities to seek tax savings for the ultimate benefit
of its ratepayers when the Commission eventually divides the
savings equitably between the utility and its ratepayers in
calculating rates. We hold, for this reason, that there exists no
contradiction between the "normalization" requirement and Houston
Lighting. (12)

 The Company contends that using the tax losses of
unregulated affiliates to reduce the income tax expense of a
regulated affiliate violates normalization rules. We reject this
argument for two reasons. First, although no Texas case has
addressed this question directly, the parties in Houston Lighting
apparently raised the issue of normalization violations in their
motion for rehearing. (13) In his dissent to the court's overruling
of the motion for rehearing, Justice Wallace asserted that taxable
revenues and deductible expenses must be segregated on the basis of
whether they are generated by a utility or non-utility. Id. He
also warned that permitting a deduction to go to the entity that
did not bear the loss could cause the I.R.S. to deny the utility
the right to depreciate its assets on an accelerated basis, an
argument the Company vigorously presses in this case. No other
member of the supreme court joined Justice Wallace's dissent; we
therefore conclude that the supreme court rejected the dissent's
contentions. 

 Secondly, we believe that the very text of PURA
§ 41(c)(2) refutes the Company's contention that reducing a
utility's tax expense because of losses by non-regulated affiliates
violates normalization rules. If the first sentence of PURA
§ 41(c)(2) requires a separate computation, as we think it does,
consolidation must mean something more than elimination of
intercompany profit and amortization of investment tax credits. We
believe that it requires the Commission to include in the Company's
tax expense any losses that may reduce the utility's tax liability,
even if unregulated affiliates suffered the losses. As discussed
above, "normalization" is an accounting method for depreciation
deductions; it does not speak to the issue of reducing a utility's
tax expense because of its affiliates' losses.

 The Company argues that it receives no benefit from a
consolidation of tax returns. It explains that it determines its
separate income-tax liability and pays that amount to its parent
corporation. The parent, GTE Corporation, then pays the
consolidated-tax liability and distributes the amount left over to
those subsidiaries whose investments, expenses or losses gave rise
to the tax benefit. We do not pass on the question whether it was
advantageous for the Company to consolidate returns; this is a
question for the Commission. We do believe, however, that the
Commission was required by statute to find either (1) that it was
not advantageous for the Company to consolidate returns or (2) that
the Commission had computed taxes as though a consolidated return
were filed and the utility had received its fair share of savings
from the consolidated return. The Commission cannot satisfy the
explicit requirements of the statute merely by a finding that the
Company's income-tax expense should not be adjusted for
consolidated tax savings. (14)

 D. Basis for Reversal

 In their motions for rehearing, both the Company and the
Commission argue that extensive underlying findings of fact support
the Commission's ultimate findings. They mistake the basis for the
Court's holding, however. The issue is not whether the Commission
made the underlying facts required by APTRA § 16(b), but whether it
followed its governing statute, PURA § 41(c)(2). Disobeying the
statutory guidelines is a ground for reversal by a reviewing court.
APTRA § 19(e)(1).



Disallowed-Expense Deductions


 The Company incurs certain operating expenses which PURA
§ 41(c)(1) and (3) prohibit the Company to include in its operating
expenses for rate-making purposes. These include lobbying
expenses, certain advertising expenses, and payments to various
affiliates. The Cities and Public Counsel contend the Commission
erred by not requiring the Company to pass on to its customers,
through the rate calculation, the tax deductions taken for these
"disallowed expenses." We agree.

 The Texas Supreme Court held, in Houston Lighting, that
any tax savings actually enjoyed by a utility should inure to the
benefit of ratepayers. See also Suburban Utility, 652 S.W.2d at
362-64. In Houston Lighting, the utility actually took a tax
deduction for expenses incurred in the management of its Allen's
Creek Nuclear Plant, which expenses the Commission had disallowed
in computing the utility's costs of service for ratemaking
purposes. Even though the utility could not pass on to ratepayers
the expenses it had incurred in connection with the nuclear plant,
the court held the utility must include, in its rate calculation,
the tax savings obtained when deductions were taken for these
expenses in calculating the utility's income-tax liability.

 In regard to the tax deductions taken for "disallowed
expenses," the Commission's order includes two "Conclusions of
Law":



CL 14. Section 43(c)(3) [sic] prohibits the Commission
from considering for rate-making purposes any expenditure
found to be unreasonable. To include disallowed expenses
in the computation of income taxes is to consider them
for rate-making purposes in violation of section 43(c)(3)
[sic].


CL 16. Including disallowed expenses in the computation
of federal income tax expense violates the consistency
requirement in the normalization rules. Accordingly,
such a treatment would violate the requirement in PURA
and the Commission's substantive rules requiring
utilities to compute federal income taxes on a normalized
basis.



The first conclusion conflicts with the supreme court's holding in
Houston Lighting that any tax savings taken by a utility must inure
to the benefit of the ratepayers, regardless of whether the expense
bringing about the deduction is includable in the utility's cost of
service under PURA § 41(c)(3).

 The Company argues (as the Commission stated in its
Conclusion of Law 14) that including deductions taken for
disallowed expenses in a utility's rate is equivalent to taking
into account a "disallowed expense" in ratemaking, in violation of
PURA § 41(c)(3). (15)
 We believe the matter settled, however, by the
holding in Houston Lighting. Furthermore, the issue does not
concern a violation of § 41(c)(3), but rather compliance with § 39
and Houston Lighting. Passing a deduction on to ratepayers is not
the same thing as considering a "disallowed" expense for ratemaking
purposes under § 41(c)(3). The purpose of § 41(c)(3) is to ensure
that utilities do not pass on to ratepayers their expenses for
unreasonable costs or costs incurred which are not necessary for
the supplying of utility services, and to ensure that utilities
recover only that amount of revenue permitted by PURA § 39(a) -- "a
reasonable return on its invested capital . . . over and above its
reasonable and necessary operating expenses." The terms of PURA
§ 41(c)(3) forbid passing along to ratepayers certain expenses, but
say nothing of savings.

 For the reasons stated, we sustain the point of error
raised by Public Counsel and the Cities regarding disallowed-expense deductions. APTRA § 19(e)(1).



EFFECTIVE DATE OF THE COMMISSION'S FINAL ORDER


 The provisions of PURA § 43 govern when a utility wishes
to change its existing rates. The utility must file in the
Commission a statement of intent to change its rates, including
therein a schedule of the proposed new rates and the date they are
to become effective. PURA § 43(a). If the schedule portends a
"major change" in rates, as defined in PURA § 43(b), the Commission
must "enter on a hearing to determine the propriety of such
change." "Pending the hearing and decision," however, the
Commission may suspend the effective date of the utility's proposed
new rates for as many as "150 days beyond the date on which the
schedule would otherwise go into effect." PURA § 43(d). If the
Commission suspends the proposed rate schedule, the utility's
existing rates continue in force unless the Commission, in its
discretion, establishes temporary rates in lieu of the existing
rates. Id. If the Commission suspends the utility's existing
rates but fails to determine within 150 days the utility's
rate-change application, the utility may unilaterally implement a
system of unofficial rates of its own choosing, not to exceed the
proposed rates, provided the utility files and the Commission
approves a bond to secure the utility's obligation to refund or
credit any excess produced by the unofficial rates over and above
the rates finally determined by the Commission. PURA § 43(e). 
After hearing, the Commission must determine and fix the utility's
level of rates if the agency finds the proposed rates "unreasonable
or in any way in violation of any provision of law." PURA § 43(f). 
The Commission must include the rates fixed by it in an order
"served upon the utility," and "these rates are thereafter to be
observed until changed, as provided by" PURA. Id.

 Not all rate changes are initiated by a utility. It is
the Commission's duty "to insure that every rate made, demanded, or
received by any public utility . . . shall be just and reasonable,"
and not "unreasonably preferential, prejudicial, or discriminatory,
but . . . sufficient, equitable, and consistent in application to
each class of consumers." PURA § 38. Accordingly, the Commission
itself is authorized to initiate a rate-change proceeding "on its
own motion or on complaint by any affected person." PURA § 42;
see, e.g., P.U.C. of Texas v. Pedernales Elec. Co-op., 678 S.W.2d
214 (Tex. App. 1984, writ ref'd n.r.e.). If the Commission, after
reasonable notice and hearing, finds in such a case "that the
existing rates of any public utility for any service are
unreasonable or in any way in violation of any provision of law,"
the Commission "shall determine the just and reasonable rates . .
. to be thereafter observed and in force, and shall fix the same by
order to be served on the public utility." Id. These "rates shall
constitute the legal rates of the public utility until changed as
provided in" PURA. Id.

 The record of agency proceedings and the briefs indicate
that the Company first initiated, in February 1984, a rate-change
proceeding under PURA § 43. Its proposed rates were suspended for
150 days, and continued to be suspended by agreement for an
extended period thereafter. The Commission did not establish
temporary rates, and the Company did not implement a system of
unofficial "bonded" rates. The Company thus continued to charge,
pendente lite, its existing rates.

 By an amendment of the tax code, effective October 1,
1985, the Legislature excluded from the gross-receipts tax any sums
received by a utility from its sale of telecommunication services. 
Simultaneously, however, the amendment included the sale of such
services within the scope of the sales tax. See 1985 Tex. Gen.
Laws, ch. 206, § 10, at 793 [since repealed]; 1959 Tex. Gen. Laws,
3d C.S., ch. 1, art. 11.06, at 304 [since repealed]; 1985 Tex. Gen.
Laws, ch. 206, § 3, at 792 [since amended, now codified as Tex. Tax
Code Ann. § 151.0101(a)(6) (Supp. 1991)]; Tex. Tax Code Ann.
§ 151.010 (Supp. 1991). 

 The Company, after October 1, 1985, began including in
its customer invoices a "surcharge" to collect the sales tax while
continuing to charge for its telecommunication services according
to its existing rates. The Company's collection of the sales tax
was, of course, neutral in its effect on the Company, which simply
remitted those collections to the State. But the calculation of
charges according to the Company's existing rates resulted in a
"windfall" in a certain sense: because the Company was no longer
subject to the gross-receipts tax, the existing rates yielded the
Company an equivalent increase in net income.

 In 1986, the Cities complained to the Commission
regarding "the double collection of state taxes," and the
Commission apparently initiated a temporary-rate proceeding under
PURA § 43(d). Before this was completed, however, the Company sued
in district court to enjoin the Commission proceeding. The court
did not enjoin the proceeding, but the temporary-rate issue was
apparently abandoned by all parties and the Company continued to
charge its existing rates. (16)

 On March 27, 1987, the Company withdrew its original
application for a rate increase according to the "package" which
accompanied its statement of intent. On June 1, 1988, however, the
Company filed a new "package," proposing rates that would increase
its annual intrastate revenues by about $81.4 million.

 Although the record indicates that the Company's proposed
rates were suspended, it does not indicate that the Commission
established temporary rates or that the Company implemented a
system of unofficial "bonded" rates subject to refund.

 After final hearing, the Commission required the Company
to reduce its rates as necessary to diminish its annual revenue by
about $59 million, and to refund to its customers, by credits on
future invoices, some $140 million. The Commission's final order
also determined: (1) the Commission possessed authority under PURA
§ 42 and § 43 to make new rates retroactive to the date the General
Counsel filed an answer to the Company's first application or the
date the Company filed its second application; (2) PURA § 43(i)
(dealing with rates proposed by a "local exchange company") "does
not make the Commission's retroactive rate-making authority
contingent on the date of its final determination in this case";
and (3) the rates required by the Commission's final order would be
effective January 1, 1987 "in order to do equity in light of [the
Company's] dilatory tactics . . . in this case" and because "[t]he
gross receipts taxes and federal income taxes embedded in the
company's rates were at higher levels than the company actually
paid since that date." The district court reversed the
Commission's order because it purported to fix the effective date
of the Company's rate retroactively. We agree with this holding
and the resulting reversal of the Commission order.

 On appeal to this Court, the Cities, State Purchasing,
Public Counsel, and the Commission complain that the district court
erred in reversing the retroactive effective date of the order. 
The Cities complain that the Commission did not go far enough back
in time when it gave retroactive effect to its new rates--that the
effective date of January 1, 1987, still permitted the Company a
"windfall" by reason of its collecting the sales tax while being
exempt from the gross-receipts tax during the calendar year 1986. 
Because we hold PURA § 42 and § 43(f) preclude the Commission from
making its official rates effective at a date earlier than that of
its final order under either statute, we will overrule the parties'
points of error regarding retroactivity. We need not, in
consequence, discuss the Cities' contention that the Commission
should have set an effective date for the rate decrease which would
have allowed ratepayers to recover the "over-collection" received
by the Company in 1986. 

 We have held previously that PURA does not authorize the
Commission to make its new official rates effective at a date
earlier than the date of the order fixing those rates. See Texas
Ass'n (TEXALTEL) v. Public Utility, 798 S.W.2d 875, 882 (Tex. App.
1990, writ denied); Southwestern Bell, etc. v. Public Util., etc.,
615 S.W.2d 947, 955 (Tex. Civ. App. 1981, writ ref'd n.r.e., 622
S.W.2d 82). See also Public Utilities Com. v. United Fuel Gas Co.,
317 U.S. 456, 464 (1943). We shall, however, expand on the
reasoning by which we reached that view.

 The purpose of making rates effective at a date earlier
than the order fixing them is to compensate for the effects of
"regulatory lag," or unusual delay in the proceeding in which the
Commission fixes the rates. Railroad Com'n of Texas v. Lone Star
Gas Co., 656 S.W.2d 421, 427 (Tex. 1983). Whether any regulatory
body possesses the power to make its new rates effective earlier
than the date it fixes the rates is a question of statutory
construction -- did the legislature delegate that power to the
Commission?

 The issue thus comes within the general rules: a
commission has only those specific powers conferred upon the agency
by law, in clear and express language, as well as any power
necessary to make effective any specific power that is granted in
clear and express language. One may not, however, on a theory of
necessary implication, impute to the commission a power, function,
or duty that really amounts to a new and additional power or one
that contradicts a relevant statute, no matter how expedient the
new power might be for purposes of administration. See Sexton v.
Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 137-38 (Tex. App.
1986, writ ref'd n.r.e.) and authorities cited. Moreover, the
possible implication of a power does not extend so far as to vest
in the agency an implied power to supplant a method or procedure
that the legislature itself has designated for the circumstances. 
The legislature's method or procedure prevails over that of the
agency; "the prescribed method excludes all others, and must be
followed." Cobra Oil & Gas Corp. v. Sadler, 447 S.W.2d 887, 892
(Tex. 1968); Foster v. City of Waco, 255 S.W. 1104, 1105 (Tex.
1923); Balios v. Texas Dept. of Public Safety, 733 S.W.2d 308, 311
(Tex. App. 1987, writ ref'd).

 The only relevant statutory provisions, requiring
construction, are those contained in PURA. Nothing in PURA
purports to delegate to the Commission, in clear and express
language, a power to assign new rates an effective date earlier
than the order in which they are fixed. Indeed, PURA adopts a
uniform principle that such rates shall be effective no earlier
than the date fixing them. This is declared most explicitly in
PURA § 26(g), a statute not applicable here, but it is also
declared explicitly in those that are applicable -- PURA §§ 42 and
43(e). Both direct the Commission to determine and fix just and
reasonable rates in an order served on the utility, and conclude
with the mandate that such rates shall "thereafter" be "observed"
until changed in a manner authorized by PURA. The word thereafter
"in terms thus gives the Commission power to prescribe such rates
prospectively only . . . . There is no basis in the statute for
concluding the Commission's orders can be retroactive to the date
when the Commission's inquiry into the rates was begun; on the
contrary, the explicit language of the statute precludes such a
construction." Public Utilities Com. v. United Fuel Gas Co., 317
U.S. 456, 464 (1942) (emphasis added). Far from conferring "in
clear and express language" the power to make rates effective at a
date earlier than the order fixing them, that language provides
precisely to the contrary. We shall, nevertheless, continue in our
analysis of the Commission's claim to have the power by
implication.

 The Commission determined that the early effective date
of the new rates was required "in order to do equity in light of
[the Company's] dilatory tactics . . . ." This falls squarely
within the purpose of a legislative grant of the power to make
rates effective at a date earlier than the date they are fixed --
the purpose of providing a remedy for the effects of "regulatory
lag." But the legislature provided its own statutory remedy to
serve that purpose. We refer, of course, to the system of rate
suspension, temporary rates fixed by the Commission, and "bonded-in" rates fixed by the utility when unusual delay occurs, as this
system is established in PURA § 43(d) and (e) to provide for rates
effective pendente lite. There is no similar provision for
temporary and "bonded-in" rates in Commission-initiated rate
proceedings under PURA § 42, the legislature being content
evidently to rely upon the Commission's diligence in ferreting out
when and to what extent a utility's rates have become unjust,
unreasonable, or in violation of law, using its investigative
powers for the purpose, as it did in P.U.C. of Texas v. Pedernales
Elec. Co-op., Inc., 678 S.W.2d 214 (Tex. App. 1984, writ ref'd
n.r.e.).

 As indicated in Cobra Oil & Gas Corp. and the other
decisions listed above, we are not free to impute to the
Commission, by necessary implication, a power to provide its own
remedy for "regulatory lag" to be utilized in lieu of the
legislatively prescribed remedy, especially when the Commission's
remedy contradicts the clear and express language that utility
rates shall be effective after the Commission's order fixing them. 
In the present case, the terms of PURA §§ 43(d) empowered the
Commission to fix temporary rates to serve the purpose of
compensating for the Company's "dilatory tactics." No additional
power was required by way of necessary implication.

 In its motion for rehearing, Public Counsel argues that
if the Commission lacks the power to make rates effective at a date
earlier than the order that fixes them, then the Commission should
have the power under PURA § 42 to suspend a utility's existing
rates and to set temporary rates fixed by the Commission. (The
Commission initiated a proceeding under PURA § 42 after the Company
initiated its own rate-change application under PURA § 43.) As
proof of the Commission's need, Public Counsel cites the length of
the proceeding in the present cause, which began in 1984. We
reject the argument. The power to suspend the Company's rates and
to establish temporary rates existed in the present case by virtue
of PURA § 43(d), for the Company itself initiated a proceeding to
change its rates under PURA § 43. This is, therefore, not an apt
case to raise the contention. Moreover, it is not our place to
supply omissions in legislation concerning the problem of
"regulatory lag"; the change should come from the legislature. 
Lone Star Gas Co., 656 S.W.2d at 427. More importantly, perhaps,
it appears to us that such power might be inconsistent with the
general tenor and purpose of PURA § 42. In those proceedings, the
legislature elected apparently to rely upon a diligent Commission
in initiating rate inquiries on its own initiative. In any case,
we are not free in the present case to consider whether such a
power exists by necessary implication; and, of course, we do not
purport to make a decision in the matter. 

 In its motion for rehearing, the Commission contends we
err in finding that PURA does not authorize the Commission to make
its new rates effective earlier than the date of its order and
service of the order on the utility. The Commission argues first
from PURA § 2, which requires the Commission to balance the
interests of utilities and consumers in setting rates. (17) We reject
the argument. PURA §§ 42 and 43 provide expressly and clearly that
rates shall be effective after they are found to be just and
reasonable by the Commission, in an order served upon the utility,
as discussed above at length. If the Commission possessed the
power to make its new rates effective at an earlier time, by
necessary implication from PURA § 2, then the more specific
language of PURA §§ 42 and 43 would be unnecessary and indeed
meaningless. It is a familiar rule of statutory construction, of
course, that a specific provision governs and qualifies a general
provision. Ayre v. Brown & Root, 678 S.W.2d 564, 566 (Tex. App.
1984, writ ref'd n.r.e.).

 The Commission argues next that our reasoning and
interpretation of PURA §§ 42 and 43 are contrary to the precedents
mentioned below.

 We do not believe the supreme court rejected our views by
its decision in Railroad Com'n v. Moran Utilities Co., 728 S.W.2d
764 (Tex. 1987). There, the court expressly based its decision
solely on an explicit provision for the refund of illegally
collected sums, as authorized by the terms of Tex. Rev. Civ. Stat.
Ann. art. 6055 (1962). Moran Utilities, 728 S.W.2d at 767 n.2. 
The court noted, moreover, that reasonable statutory procedures
affecting a utility's rates (such as those setting the effective
date of rate orders) do not amount to an unconstitutional
confiscation of the utility's property. Id. at 768.

 Nor do we believe the supreme court rejected our views by
its decision in Lone Star Gas Co. The court in Lone Star expressly
limited the effect of its decision to cases arising before
September 1, 1983, the effective date of "the new Gas [Utility]
Regulatory Act." Lone Star Gas Co., 656 S.W.2d at 427. It is not
within our power to override this express limitation concerning the
effect of the supreme court's decision. The significance of
September 1, 1983 was that it was the effective date of the new Gas
Utility Regulatory Act, an enactment that made express provision to
compensate for regulatory lag -- provisions allowing for "bonded-in" temporary rates in terms almost identical to those found in
PURA § 43(e). 1983 Tex. Gen. Laws, ch. 263, § 20, at 1209. This
provision of the new enactment cured the problem raised in Lone
Star Gas Co. -- there was no provision for a utility to "bond-in"
rates in rate cases initiated before the governing body of a
municipality (the City of Kaufman in that case) and reviewed do
novo by the Commission: "The rates within the city of Kaufman over
which the Commission exercised appellate jurisdiction and which
represent most of Lone Star's revenues in controversy are not
subject to being `bonded in.'" Lone Star Gas Co., 656 S.W.2d at
425; see also Arkansas Louisiana Gas Co. v. Railroad Commission of
Texas, 586 S.W.2d 643 (Tex. Civ. App.--Austin 1979, writ ref'd
n.r.e.). Moreover, the new enactment provided expressly that
"[a]ny rates, whether temporary or permanent, set by the railroad
commission shall be prospective and observed from and after the
applicable order of the commission, except interim rate orders
necessary to effect uniform systemwide rates." 1983 Tex. Gen Laws,
 supra, at 1196. In summary, we believe the supreme court held as
it did in Lone Star Gas Co. because there was in the relevant
regulatory system no provision prescribed by the legislature to
compensate for the effects of unusual regulatory lag; hence it was
permissible to rely upon an implied power. Such is not the present
case, of course, where the legislature has provided for "bonded-in"
rates for that purpose and those statutory provisions in PURA
§ 43(d) were available for the purpose. In Lone Star Gas Co. the
implied power did not supplant a legislative remedy; in the present
cause, it would. 

 Finally, State Purchasing argues in its motion for
rehearing that the decision on the effective-date issue conflicts
with a recent case decided by this Court, City of El Paso v. Public
Utility Com'n, No. 3-90-007-CV (Tex. App. May 8, 1991) (motions for
rehearing pending). In City of El Paso, this Court allowed a
utility which incurred increased operating costs to increase its
rates to compensate for the "regulatory lag" between the time when
it incurred the costs and the time when new rates went into effect. 
State Purchasing argues that the utility was permitted to charge
future customers for past underrecoveries by increasing prospective
rates, amounting to a retroactive rate increase.

 We disagree with State Purchasing's contention that the
cases are inconsistent. The retroactive ratemaking issue in City
of El Paso involved PURA § 41(a), which states that utility rates
must be based upon the original cost of property used by and useful
to the public utility in providing service. The Legislature, then,
has explicitly authorized the Commission to consider the costs of
invested capital in setting rates. Although this may have the
effect of imposing costs incurred during the period of regulatory
lag on utility customers, including these costs in the utility's
rate base is consistent with the legislative intent. In contrast,
PURA §§ 42 and 43 forbid the Commission from making its rates
effective before the date the rate is fixed and the rate order is
served upon the utility to compensate for regulatory lag.

 We therefore hold that the district court did not err in
reversing the Commission's order insofar as it purported to
implement a retroactive effective date. (18)
 The points of error
regarding that issue are overruled. (19)



THE DISTRICT-COURT JUDGMENT


 The district-court judgment reverses the Commission's
final order on the Company's single complaint that the Commission
erred as a matter of law when the agency assigned the new rates an
effective date of January 1, 1987. Concerning the Company's other
complaints and those of the other parties in the cause, the
district-court judgment declares them moot or decided adversely to
the party making them, without identifying any particular complaint
or party.

 We affirm that portion of the district-court judgment
that reverses the Commission's final order on the ground that that
order purports to set an effective date for the rate change earlier
than the date of the order fixing the rate.

 After reversing the Commission's final order, however,
the district-court judgment goes further. It directs the
Commission to implement a surcharge that would allow the Company to
recover any sums previously refunded by the Company, together with
"interest and other costs associated with such refund." The
judgment expressly leaves to the Commission the issue of whether
the surcharge should include an amount allowing the Company to
recover "attorneys fees." We disagree with this aspect of the
district court judgment, and remand the cause to that court with
instruction that the remand to the agency be general.

 The Revised Model State Administrative Procedure Act of
1961 (from which APTRA was taken) allowed reviewing courts to
modify agency orders in appropriate circumstances. This
authorization to modify orders was deleted in APTRA "in order to
retain the Texas rule that courts may not write certain orders for
the agency or direct it to do so in specific terms." D. McCalla,
The Administrative Procedure and Texas Register Act, 28 Baylor L.
Rev. 445, 492 (1976).

 The Texas Supreme Court had stated earlier that a court
"has the right to review the action of the Railroad Commission, and
to strike its orders down if they are illegal; but it has no
authority to write a proration order for the Commission, nor to
prescribe the terms of the subsequent order to be entered by the
Commission." Marrs v. Railroad Commission, 177 S.W.2d 941, 950
(Tex. 1944). The court added that the discretion to devise a
proration scheme had been committed to the Railroad Commission, and
it would be a usurpation of the Commission's authority for the
court to prescribe the terms of the order. Id. That same
reasoning applies in this case; a reviewing court may not make
substantive decisions committed by statute to the Public Utility
Commission.

 In its motion for rehearing, the Company cites opinions
by this Court for the correct proposition that a reviewing court
may control the scope of a remand to the agency. See First Savings
& Loan Ass'n of Del Rio, Tex. v. Lewis, 512 S.W.2d 62, 64 (Tex.
Civ. App. 1974, writ ref'd n.r.e.). This Court has also stated in
a utility rate case that if a reviewing court sustains a utility's
allegations of error, "the proper judgment will be one of remand to
the agency with instructions to re-determine the utility's annual
revenue increase in light of the final decisions made upon the
utility's various contentions of error." Southwestern Bell, etc. v.
Public Util., etc., 615 S.W.2d 947, 955 (Tex. Civ. App. 1981, writ
ref'd n.r.e., 622 S.W.2d 82). It does not follow, however, that
the power to control the scope of a remand necessarily authorizes
a district court to modify the agency's final order. As the
supreme court declared in Marrs, the terms of the final order are
matters committed to agency discretion as long as the agency
corrects the errors sustained on appeal.

 The terms of APTRA § 19(e) authorize expressly only a
general remand when a party's substantial rights are prejudiced by
an agency error of the kind described in subsections (1) through
(6). It is sufficient that the cause must be remanded generally to
the Commission in order to effectuate our decision and judgment,
which rests on the several grounds given above. (20)

 We therefore affirm that part of trial-court judgment
reversing the Commission's order. We reverse that judgment insofar
as it affirms the Commission's order. We remand the cause to the
district court with instructions that the cause be remanded to the
Commission for proceedings not inconsistent with our opinion.



 

 John Powers, Justice

[Before Justices Powers, Aboussie and Kidd]

Affirmed in Part; Reversed and Remanded in Part with Instructions

Filed: November 13, 1991

[Publish]
1. The Cities' briefs on appeal list 88 cities, but only 86 are shown on the Cities' notice of
appeal.

2. Throughout our opinion we have added the emphasis where it appears in quotations.

3. [3] Throughout our discussion, we refer to the Company's common stock as its "common
equity" merely because we do not wish to deviate from the terminology used by the Commission
in the proceeding below. We note, however, that the term "equity" is broadly defined as "the
spirit and the habit of fairness, justness, and right dealing which would regulate the intercourse
of men with men, -- the rule of doing to all others as we desire them to do to us." Black's Law
Dictionary, at 634 (rev. 4th ed. 1968). The term has also come to mean "the remaining interest
belonging to one who has pledged or mortgaged his property, or the surplus of value which may
remain after the property has been disposed of for the satisfaction of liens." Id.


 Although some use the term "common equity" to mean "common stock," see
Utilities Com'n v. Public Staff, 323 N.C. 481, 374 S.E.2d 361, 364 (1988); Hawes, Utility
Holding Companies, § 5.07 (1984), we do not approve such misuse of the term "equity." We
employ that usage only for the reason stated above.


4. [4] The 10.85% figure is the cost of equity that Public Counsel's witness Carol Szerszen
recommended during her cross examination. We note that the Examiner's Report attributes to
Szerszen a recommended cost of equity of 10.73%.
5. [5] GTE-Southwest argues that because it and GTE Directories are involved in a joint venture,
it does not pay an expense to GTE Directories, and the arrangement therefore does not come
within the scope of § 41 (c)(1). The administrative law judge explicitly rejected this argument,
and the Commission made no findings that would support such a position. We may not find facts
which the Commission declined to find. See Gulf Land Co. v. Atlantic Refining Co., 131 S.W.2d
73, 84 (Tex. 1939) ("[T]he Commission determines primarily and finally all fact issues,--that is,
all issues that are not established as a matter of law.").
6. [6] We need not address the Cities' other grounds of attack on Finding of Fact 16, as we sustain
the Cities' point of error for the reasons stated in the text of our opinion.


 Furthermore, the Company contends and the Commission concluded in its "Finding
of Fact 16," the Commission could not equitably disallow expenses incurred by the Company in
its transactions with GTE Directories and, simultaneously, include in the rate calculation revenues
received from the directory sales. We disagree. As Commissioner Campbell pointed out in her
dissent, the payments to GTE Directories comprise only part of the expense the Company incurs
in connection with the publication of the directories. The Commission did not "disallow" other
expenses incurred in the publication of the directories which are not payments to affiliates.
7. [7] Other "Conclusions of Law" relevant to the consolidated-tax-return issue include
the following:


CL 13. Section 27(e) [sic] requires utilities to keep separate accounts to show
profits and losses from the sale of equipment not integral to the provision of utility
service, and it prohibits the Commission from considering such profits in
determining a utility's rates.


CL 15. Because GTE Corp's consolidated return assigns to each subsidiary its
proper income tax liability, reducing GTE Southwest's income-tax expense would
reduce its deferred federal income-tax liability in violation of the normalization
provisions of the Internal Revenue Code and related regulations. Such a treatment
would also violate the consistency requirement in the normalization rules. As a
result, it would violate the requirement in PURA and the Commission's substantive
rules requiring utilities to compute federal income taxes on a normalized basis.

8. "SCHEDULE V"


(Appended to Commission's Order)



Public Utility Commission of Texas


 General Telephone Company of the Southwest - Docket No. 5610
(Revised)

Federal Income Taxes


(000's)



 Examiner Change Final Order

Return $136,547 (2,306) $134,241


Less:

Interest Expense 65,965 1 65,966

Amort. of Excess DFIT 5,049 1,888 6,937

Amortization of ITC 10,736 0 10,736

Preferred Stock Dividend 15 0 15

Consolidated Tax Savings 0 0 0

Disallowed Expenses 0 0 0

Plus:

Additional Depreciation 7,487 0 7,487

80% Limitation on Meals 213 0 213


Taxable Income After

 Income Taxes 62,482 58,287

Tax Factor 0.51515152 0.51515152


Tax @ 34% 32,188 30,027


Less:

Amort. of Excess DFIT 5,049 1,888 6,937

Amortization of ITC 10,736 0 10,736


Total Federal Income Taxes $16,403 $12,354


9. [9] We assume the reference to the examiner's report contained a typographical error. The
discussion of the consolidated-tax-return issue is in section III.C. Section III.B. discusses a
completely different issue.
10. [10] The utility can avoid the computation required by PURA § 41(c)(2) by convincing the
regulatory authority that it is reasonable to choose not to consolidate returns. Perhaps the
Commission's conclusory determinations can be said to amount to a determination that the
exception in PURA § 41(c)(2) applies: that the Company had "shown to the satisfaction of the
[Commission] that it was reasonable to choose not to consolidate returns." In either case,
however, the Commission's conclusory determinations refer necessarily to the statutory factors
that PURA § 41(c)(2) required the Commission to consider in calculating the Company's income-tax liability for inclusion in its operating expenses for rate-making purposes. Thus, if the
Commission believed that the exception applied in this case, it was bound to include in its final
order an ultimate finding to that effect, as well as findings of basic or underlying fact that
supported its conclusory determinations. APTRA § 16(b); Texas Health Fac. v. Charter Medical-Dallas, 665 S.W.2d 446, 451 (Tex. 1984). The absence of an ultimate finding and supporting
findings implies that the Commission did not act upon the exception carved from the general rule.
See APTRA § 19(e)(1).
11. [11] It has been said that "the imprecision of the 'actual taxes paid' formulation is exceeded only
by the name of the Holy Roman Empire: two out of the three words are wrong. Taxes, yes. But
not necessarily actual taxes, since inexact estimations are often allowed." City of Charlottesville,
VA. v. F.E.R.C., 774 F.2d 1205, 1215 (D.C. Cir. 1985), cert. denied, 475 U.S. 1108 (1986)
(emphasis original). Furthermore, as Justice Scalia points out in the majority opinion in
Charlottesville, taxes included in the rate calculation are often not "paid," but instead "incurred,"
as "normalization" rules permit utilities to pass along to ratepayers, on a straight-line schedule,
taxes deferred by the use of accelerated depreciation. Charlottesville, 774 F.2d at 1215.

12. [12] We note that the Internal Revenue Service has withdrawn the notice of a proposed rule
entitled Normalization: Inconsistent Procedures and Adjustments, 55 Fed. Reg. 49294 (1990),
which addressed the extent to which "certain utility ratemaking procedures and adjustments that
are based on tax savings attributable to the filing of a consolidated tax return" violate
normalization requirements. See 56 Fed. Reg. 19825 (1991).


13. [13] In Houston Lighting the Commission disallowed $166 million as imprudent expenses for
ratemaking purposes, but required the utility to pass on to its ratepayers the tax write-off for these
expenses. The supreme court required the shareholders of Houston Lighting & Power's parent
corporation, Houston Industries, Inc., to bear the losses. Houston Lighting, 748 S.W.2d at 443
(Wallace, J., dissenting). In Houston Lighting the unregulated entity had to bear the losses of the
regulated affiliate; here, the regulated affiliate had to bear the losses of unregulated affiliates. We
do not believe this distinction warrants a different result.
14. [14] While GTE-Southwest may receive no tax savings from this method, the parent
corporation surely does. It benefits to the extent of the time value of money that it saves from
deferred taxes. Moreover, GTE-Southwest finds itself in the position of arguing that it should be
allowed to subsidize its affiliates with the revenue it receives from ratepayers. We do not believe
this argument is consistent with the holding in Houston Lighting.
15. The following are relevant portions of PURA § 41(c)(3):



Expenses Disallowed. The regulatory authority shall not consider for
ratemaking purposes the following expenses:


(A) legislative advocacy expenses, whether made directly or indirectly,
including but not limited to legislative advocacy expenses included in
trade association dues; 


* * * * *



(D) any expenditure found by the regulatory authority to be
unreasonable, unnecessary, or not in the public interest, including but
not limited to executive salaries, advertising expenses, legal expenses,
and civil penalties or fines.



16. [16] State Purchasing and the Commission both assert that the Commission did not abandon the
temporary-rate issue, but instead was "judicially prevented" from setting such rates. We disagree
with their contention. The record reflects that the district judge never signed an order enjoining
the Commission from setting temporary rates. The Commission apparently pursued the matter
no further after receiving a letter from the district judge stating he was prepared to issue a
temporary injunction. The Commission cannot now complain of the district judge's action when
it failed to secure a ruling on the temporary-rate issue.
17. [17] PURA § 2 reads in part, "The purpose of this Act is to establish a comprehensive
regulatory system which is adequate to the task of regulating public utilities as defined by this Act,
to assure rates, operations, and services which are just and reasonable to the consumers and to the
utilities." Public Utility Regulatory Act, Tex. Rev. Civ. Stat. Ann. art. 1446c, § 2 (Supp. 1991).
18. [18] Because we base our holding on the PURA prohibition against retroactive ratemaking, we
need not address Public Counsel's fourth point of error which contends the district court erred in
its conclusion that setting a retroactive effective date for a rate change is unconstitutional.

19. [19] Because we hold that PURA prohibits the Commission from setting an effective date for a
rate change which precedes the final order, we need not address an argument posed by the Cities
and State Purchasing that the Commission's use of a retroactive effective date constituted proper
punishment for the Company's use of unspecified "dilatory tactics."


20. [20] Because we reverse the district-court judgment on the grounds stated above, we need not
address the Commission's point of error alleging that the district court erred in not sustaining its
pleas to the jurisdiction and motions to strike the intervention of several parties.


 In its motion for rehearing, the Commission contends that this Court should have
decided whether Public Counsel was entitled to intervene. The Commission asserts that Public
Counsel failed to invoke the jurisdiction of the district court. According to the Commission, a
party's right to appear before the court is a fundamental issue; therefore, this Court's reversal of
other legal rulings by the district court does not settle the question whether the district court had
jurisdiction over Public Counsel and its claims.


 We reject this argument. This Court is to address every issue "necessary to final
disposition of the appeal." Tex. R. App. P. Ann. 90(a) (Pamph. 1991). Deciding the issue of
Public Counsel's right to intervene was not necessary to the Court's disposition because the Cities
raised the same points of error that Public Counsel raised.